STATE OF NORTH CAROLINA v. MICHAEL LEMARK WARD

No. 68A99

(Filed 9 November 2001)

## 1. Homicide— first-degree murder—selective prosecution

The trial court did not err by denying defendant's motion to dismiss the indictment for first-degree murder even though defendant claims the district attorney exercised selective prosecution, because: (1) defendant has presented no evidence establishing that any improper consideration influenced the district attorney's decision to prosecute him for first-degree murder; (2) there is nothing in the record to suggest that defendant's mental disability played any role in the district attorney's election to try him for first-degree murder; (3) defendant failed to make a threshold showing that his prosecution was motivated by a discriminatory purpose; and (4) defendant has not demonstrated that the indictment was unconstitutional.

## 2. Sentencing— death penalty statute—constitutionality

North Carolina's death penalty statute under N.C.G.S. § 15A-2000 is not unconstitutional on its face and as applied in this case simply because the prosecutor is granted broad discretion.

## 3. Jury— deputy—custodian or officer in charge of jury— prospective witness

The trial court did not err in a first-degree murder trial by permitting a deputy who was listed as a prospective witness for the State, but who ultimately did not give testimony as a witness in this case, to serve briefly as a custodian or officer in charge of the jury and to coordinate the jury panel's transportation from Nash County to Halifax County, because: (1) upon discovering that the deputy was listed as a potential witness, the trial court promptly replaced the deputy with another bailiff; (2) the mere mention of the deputy's name during the testimony of a State's witness does nothing to impugn the integrity of our jury system, and prejudice cannot be conclusively presumed; and (3) defendant has made no showing of any actual prejudice.

4. **Criminal Law— motion for mistrial—defendant in hand- cuffs in courtroom**

The trial court did not abuse its discretion in a first-degree murder trial by denying defendant's motion for a mistrial under N.C.G.S. § 15A-1061 after defendant was led by a deputy sheriff into the courtroom wearing handcuffs in view of prospective jurors even though the trial court did not conduct a voir dire of the prospective jurors regarding this incident, because: (1) the incident did not result in any actual prejudice to defendant; (2) defendant was not handcuffed during the course of the trial; (3) the entire incident transpired within a matter of seconds and the jurors could have seen no more than a glimpse of defendant's wrists in the handcuffs; and (4) the trial court's decision not to conduct an inquiry was a reasoned one so that unwanted attention was not drawn to the fact that defendant had been handcuffed.

5. **Discovery— prospective jurors—personal information**

The trial court did not err in a first-degree murder trial by denying defendant's pretrial motion for disclosure of jury information known to the State concerning the prospective jurors' previous jury service and the verdicts rendered by the juries on which they served, because personal information about prospective jurors is not subject to disclosure by the State. N.C.G.S. § 15A-903.

6. **Jury— selection—defendant's right to remain silent and refrain from testifying**

The trial court did not err in a first-degree murder trial by failing to intervene ex mero motu and the prosecutor was not permitted to question prospective jurors in a manner that infringed upon defendant's Fifth Amendment right to remain silent and to refrain from testifying at trial when the prosecutor questioned several members of the venire as to whether they understood defendant's right to refuse to put on evidence or testify in his defense, because: (1) the prosecutor's remarks viewed in context were not impermissible anticipatory comments on defendant's decision not to testify since the prosecutor merely informed prospective jurors of the nature of defendant's right and described the testimonial process; (2) pursuant to defendant's motion, the prospective jurors were sequestered and voir dire was conducted individually, meaning that there was no repeti-

tious or extended comment that would be objectionable; and (3) any error was harmless beyond a reasonable doubt given the overwhelming evidence of defendant's guilt and the trial court's curative instruction to the jury that it was defendant's privilege to refrain from testifying.

### 7. Jury— selection—voir dire—indoctrination

The trial court did not abuse its discretion in a first-degree murder trial by failing to intervene ex mero motu to prevent the prosecutor from allegedly indoctrinating prospective jurors during voir dire regarding the manner in which prospective jurors should respond to imminent questions from defense counsel, because: (1) the questions were designed to determine whether the jurors would refrain from considering punishment until such time, if at all, as they reached the sentencing proceeding; (2) the prosecutor did not question jurors as to how they would vote, nor did he instruct them on how they should vote, under a given set of facts; and (3) the prosecutor did not misstate the law, but merely sought to determine whether prospective jurors could follow the law and serve as fair and impartial decisionmakers.

### 8. Jury— selection—voir dire—death penalty as appropriate punishment

The trial court did not abuse its discretion in a first-degree murder trial by allegedly restricting defendant's voir dire of prospective jurors concerning whether they believed the death penalty would be the only appropriate punishment if they found defendant guilty of first-degree murder, because: (1) defendant was able to establish through a series of questions that the prospective jurors at issue could fairly consider a sentence of life imprisonment as a possible punishment; and (2) the trial court sustained objections to the form of the challenged questions, but permitted defense counsel to rephrase the questions and obtain the jurors' responses.

### 9. Jury— selection—follow-up questions—views on death penalty

The trial court did not abuse its discretion in a first-degree murder trial by allegedly precluding defendant from asking follow-up questions of jurors that would have helped counsel understand the jurors' beliefs about the death penalty, because the record demonstrates that defense counsel was allowed to conduct an exhaustive examination into the prospective jurors' atti-

tudes about the death penalty and whether those attitudes would interfere with their ability to serve.

**10. Jury— limiting questions—defendant's burden to put on evidence**

The trial court did not abuse its discretion in a first-degree murder trial by allegedly limiting questions designed to determine whether the members of the venire understood that defendant had no burden to put on evidence; furthermore, defendant has failed to make any showing of prejudice resulting from the allegedly erroneous rulings.

**11. Jury— selection—challenge for cause—death penalty views**

The trial court did not abuse its discretion in a first-degree murder trial by excusing several prospective jurors for cause based on their views about the death penalty, because: (1) while it is true that many of the jurors so challenged were unable to articulate their biases against capital punishment clearly, their responses revealed either that they were predisposed to render a life sentence or that they could not envision any circumstances under which they could impose a sentence of death; (2) defendant has not shown that further questioning by defense counsel would likely have yielded different responses from the challenged jurors; and (3) there was no impropriety in the manner in which the trial court questioned the prospective jurors about their views.

**12. Constitutional Law— right to confrontation—cross-examination—contents of SBI report—refreshing recollection**

The trial court did not violate defendant's Sixth Amendment right to confrontation in a first-degree murder trial by limiting defendant's cross-examination of a captain of the sheriff's department about the contents of an SBI report unless defendant first introduced the report into evidence, because: (1) although the trial court admonished defense counsel to refrain from specific references to the SBI report, it indicated that counsel was free to direct the witness to refer to the report to refresh his recollection; (2) the captain repeatedly stated that he could not answer questions concerning the results of the forensic analysis performed on several pieces of evidence without looking at the SBI report; and (3) defense counsel, although permitted by the trial court to do so, never instructed the witness to refer to the report for purposes of refreshing his recollection.

**13. Constitutional Law— right to confrontation—cross-examination—codefendants—events on day of murder—plea arrangements**

The trial court did not violate defendant's Sixth Amendment right to confrontation in a first-degree murder trial by limiting defendant's cross-examination of his two codefendants about the events that took place on the day of the murder and about their respective plea arrangements, because: (1) defense counsel was permitted to cross-examine each of the codefendants at great length; and (2) in those instances where the trial court sustained the prosecutor's objections to defense counsel's questions, the questions called for incompetent hearsay testimony, were unduly repetitive or argumentative, or were simply improper in form.

**14. Criminal Law— prosecutor's argument—defendant's power to subpoena witnesses—failure to do so—not comment on failure to testify**

The prosecutor did not improperly comment on defendant's failure to testify in a first-degree murder trial when he argued to the jury that defendant had the power to subpoena witnesses to refute the State's evidence but failed to do so even though defendant contends he is the only witness who could have refuted the relevant evidence, because the prosecutor never directly commented on defendant's failure to testify, nor did he suggest that defendant should have taken the stand to refute the State's evidence.

**15. Appeal and Error— preservation of issues—redirect examination—failure to object—failure to assert plain error**

Although defendant contends the prosecutor improperly placed the burden on defendant to produce evidence to prove his innocence during the prosecutor's redirect examination of a captain of the sheriff's department in a first-degree murder trial, defendant waived appellate review of this issue because: (1) defendant failed to present to the trial court a timely request, objection or motion stating the specific grounds for the ruling the party desired the court to make as required by N.C. R. App. P. 10(b)(1); and (2) defendant did not assert in his assignment of error that the prosecutor's questions warranted the trial court's intervention ex mero motu.

**16. Appeal and Error— preservation of issues—jurors' conduct and duties—failure to object—failure to assert plain error**

The trial court did not err in a first-degree murder trial by failing to instruct the jurors at every recess regarding their conduct and duties in accordance with N.C.G.S. § 15A-1236, because: (1) defendant did not object to the trial court's failure to give the necessary instructions; and (2) while defendant argues plain error in his brief, he failed to include plain error as an alternative in his assignment of error in the record on appeal as required by N.C. R. App. P. 10(c)(4).

**17. Evidence— motion in limine—testimony of well-known criminal defense attorney—corroboration**

The trial court did not abuse its discretion in a first-degree murder trial by denying defendant's motion in limine to bar the testimony of a well-known criminal defense attorney and his staff stating that defendant met with the attorney on 18 December 1996, because: (1) the evidence was used to corroborate the testimony of a codefendant concerning the events leading up to the murder; and (2) defendant has not demonstrated that the jury's verdict was based on any unfair prejudice resulting from the attorney's appearance on the witness stand.

**18. Criminal Law— prosecutor's argument—defendant's post-arrest silence**

The trial court abused its discretion during a capital sentencing proceeding by failing to intervene ex mero motu during the prosecutor's argument regarding defendant's post-arrest silence while at Dorothea Dix Hospital, because: (1) the prosecutor impermissibly commented on defendant's silence; and (2) it cannot be concluded that this omission had no impact on the jury's sentencing recommendation.

Chief Justice LAKE dissenting in part.

Justice WAINWRIGHT joins in this dissenting opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Sumner, J., on 15 December 1998 in Superior Court, Halifax County, upon a jury verdict finding defendant guilty of first-degree murder. On 30 March 2000, the Supreme Court allowed defendant's motion to bypass the Court of

Appeals as to his appeal of additional judgments. Heard in the Supreme Court 13 February 2001.

*Roy A. Cooper, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Elizabeth G. McCrodden for defendant-appellant.*

BUTTERFIELD, Justice.

Defendant Michael Lemark Ward was indicted on 21 January 1997 for first-degree murder of Patricia Smith King; conspiracy to commit first-degree murder; robbery with a dangerous weapon; felonious breaking and entering; felonious larceny; felonious possession of stolen goods; and conspiracy to commit breaking, entering, and larceny. Following a capital trial, the jury found defendant guilty of first-degree murder under the theory of felony murder. The jury also convicted defendant of conspiracy to commit murder; robbery with a dangerous weapon; felonious breaking or entering; felonious larceny; felonious possession of stolen goods; and felonious conspiracy to commit breaking or entering and larceny.

In a separate capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury found as aggravating circumstances that the murder was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4) (1999); that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). In mitigation, the jury found the existence of one of the four statutory mitigating circumstances submitted: that defendant committed the offense while under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2). One or more jurors also found to exist ten of the nineteen nonstatutory mitigating circumstances submitted. The jury recommended and the trial court imposed a sentence of death for the conviction of first-degree murder. Additionally, the trial court sentenced defendant to terms of imprisonment for his convictions for conspiracy to commit breaking, entering, and larceny; conspiracy to commit murder; felonious breaking and entering; and felonious larceny. The trial court arrested judgment on defendant's convictions for felonious possession of stolen goods and robbery with a dangerous weapon.

For the reasons hereinafter discussed, we discern no prejudicial error in the guilt-innocence phase of the trial. Accordingly, we uphold

defendant's conviction of first-degree murder. However, for errors committed during the sentencing proceeding, we remand for a new capital sentencing proceeding.

At trial, the State presented evidence tending to show that the victim, Patricia Smith King, suffered a brutal beating and sustained a fatal shotgun wound to the chest while in her home on the morning of 18 December 1996. The primary witnesses for the State were code-fendants Edward Kenta Settles and Craig McKee Williams, who testi-fied pursuant to plea arrangements. Settles testified that he came to know the King family through his girlfriend, Sharon Brown. According to Settles, Brown performed housekeeping work for the victim, and he periodically helped Brown with her duties. He stated that on one such occasion, while they were cleaning windows in an upstairs bedroom of the King home, he stole some money, and Brown stole several of the victim's checks. Brown subsequently forged the checks and was arrested when the Kings learned of her activities. At the time of the murder, the charges against Brown were still pending.

Settles further testified that he telephoned defendant on 17 December 1996 about a plan he had devised to steal money and guns from the King residence. Defendant told Settles that he was inter-ested and later recruited the participation of his friend, Craig Williams.

The following morning, defendant and Williams met Settles and Roshene Mills at Settles' apartment. Defendant then drove the four men toward the King house. He parked the car—a blue Honda Accord belonging to his wife, Felicia—in a field beyond the house and tied a white rag on the passenger's door to give the impression that the car had stalled. The four men then walked along a wooded trail to a pond situated on the King property. From that locale, they had a clear view of the house and saw that the victim's car was parked at the front entrance. Settles, who insisted on remaining out of sight, told defend-ant and Williams to go to the door to determine whether the victim was at home. They did, and when the victim answered the door, they asked her for permission to fish in the pond, which she gave them. Defendant and Williams thanked her and returned to the pond, where Settles and Mills were waiting.

Their plan thwarted by the victim's presence, the four men started back toward the car. Williams, not ready to abandon the idea, made a comment to the effect that "there was no need for [them] to come down here to high society for nothing." In light of this remark,

the participants revised their plan. Williams testified that he and defendant were supposed to "break in and rob [King], knock her down or out, tie her up and open the backdoor for [Settles] and [Mills] so they could come in." Once all four men were inside, they were going to comb through the premises for items of value. Settles, however, expressed continued concerns about being identified by the victim. In response, defendant suggested, "a dead person can't talk." Taking the initiative, Williams stated, "I'd kill her, I'd kill her."

Defendant and Williams returned to the house, again leaving Settles and Mills waiting by the pond. When the victim answered the door this time, Williams said that they needed a bucket for their catch. As the victim was directing them to where they could find such a bucket, Williams kicked in the door. He then knocked the victim to the floor and hit her several times with the vacuum cleaner that stood next to the door. Defendant had also entered the house, and he too began pummeling the victim with a nearby piano stool. Defendant struck the victim with such force that the legs of the stool broke away from the seat bottom. He then picked up one of the legs and resumed his attack by striking the victim repeatedly on the head.

Williams testified that when he left the room to search for valuables, defendant was still attacking the victim. Williams stated that the victim fiercely fought for her life and that she struggled with her attacker as he bludgeoned her with the wooden leg. Williams said that he then went to the kitchen to get a knife, which he intended to give defendant "to do whatever [he had] to do" to take the victim's life. As he was returning to the front room with the knife, however, he heard two shotgun blasts. He dropped the knife and ran back into the front room, where he observed defendant standing over the victim with a double-barreled shotgun taken from the Kings' gun case. According to Williams, the victim was lying on the floor moaning and moving around.

Shortly thereafter, defendant and Williams fled the house carrying three guns that belonged to the Kings—the murder weapon, a single-barreled shotgun, and a .22-caliber rifle. The two men also absconded with the victim's purse and a few Christmas presents. When they reached the car, they discovered that Settles and Mills were gone. Settles testified that when he and Mills heard the victim's high-pitched screams, they ran all the way back to his home.

Defendant and Williams piled their loot into the car and drove toward Warrenton. Along the way, they hid the guns under an aban-

doned sofa off the highway. Williams threw the Christmas presents out the window after discovering that they contained only kitchenware. He then removed the wallet and money from the victim's purse and discarded it as well.

Luke King, age seventeen, and his brother, Robbie, age thirteen, left Halifax Christian Academy at or near 12:00 noon on Wednesday, 18 December 1996, to begin their Christmas break. They arrived home at approximately 12:30 p.m. and saw that the front screen door was detached from the structure, lying a couple of feet away from the entrance. Luke and Robbie also noticed that one of the glass panes in the front door was broken and that the bottom of the door was smeared and spattered with blood. When Luke opened the door, he saw the vacuum cleaner and piano stool lying near the entrance. Both items, he testified, were "busted up really good." He stated that he pushed the door open a little further and discovered his mother, Patricia Smith King, lying on the floor in a pool of blood. He said, "there was blood everywhere." He then dialed 9-1-1 while Robbie attempted to perform CPR on his mother. At the instruction of the 9-1-1 operator, Robbie rolled his mother onto her right side and saw a large gaping wound just under her left armpit that exposed her internal organs. After several futile attempts to revive his mother, Robbie covered her lifeless body with a blanket and waited for help to arrive.

Dr. Susan Phillips, a forensic pathologist at Nash General Hospital, performed an autopsy of the victim's body. The autopsy revealed that the victim had sustained "multiple lacerations over the top of the scalp that extended to the calvarium with avulsion of the scalp." Simply put, "there were lacerations on the skin of the scalp that extended all the way to the surface of the bone," and "[t]he injuries had caused the scalp to be detached from the skull." Dr. Phillips concluded that the victim's head injuries were caused by a blunt-type instrument.

The autopsy further disclosed multiple lacerations, bruises, and contusions on the victim's left shoulder, right and left lower arms, left thigh, and left breast. Her right little finger was lacerated to the bone, and her left wrist was broken. A shotgun entrance wound, 6.5 centimeters in diameter, was noted along the left lateral chest. The internal examination revealed that the shotgun projectile entered the body in a left to right pattern, traveling through the victim's left lung and heart and fracturing her fourth, fifth, sixth, and seventh ribs.

Based on these findings, Dr. Phillips determined that the victim had sustained a fatal shotgun wound to the left chest, multiple blunt-force injuries to the head, and multiple blunt-force defensive-type wounds. Dr. Phillips surmised that the victim was alive while she suffered the blunt-force injuries because there was hemorrhaging surrounding those injuries. The cause of death was listed as a gunshot wound to the chest.

The State's evidence further showed that on 20 December 1996, Settles went to defendant's place of employment to ask him what had transpired inside the King residence on the day of the murder. According to Settles, defendant stated that he had shot the victim because "the bitch wouldn't die." Defendant explained that he had beaten the victim with a furniture leg and that "he got tired of beating [her]," so he did "what he had to do."

Additionally, the State presented evidence that on 23 December 1996, defendant gave Williams $20.00 and sent him to Virginia to obtain a check-cashing identification ("ID") card depicting him as James King, the victim's husband. Defendant had acquired King's name and social security number from the victim's wallet. When Williams returned from Virginia, defendant, again driving his wife's dark blue Honda Accord, took Williams to a BB&T bank in Henderson. Williams entered the bank and, posing as King, attempted to withdraw $4,000 from the Kings' savings account using the fake ID. The branch manager, Lynn Stone, told Williams that she could not process the transaction because the check-cashing card was not an acceptable form of identification. After further inquiry, Williams told Stone that Sharon West, a customer service representative of BB&T in Littleton, could identify him as James King.

Stone called the Littleton branch and spoke with Ann Ellis, the branch manager. Ellis informed Stone that King was a white male, which alerted Stone to the fraud, since the man purporting to be King was black. Ellis also apprised Stone of the fact that King's wife had been murdered the previous week. After speaking with Ellis, Stone told Williams that West was at lunch and could not be reached and that he would have to return later. Once Williams left the branch, Stone accessed the Kings' account on her computer and saw that it had been flagged so as to prohibit debit transactions. She then telephoned another Henderson branch of BB&T, located on Dabney Drive, and learned that Williams was there, again trying to pass himself off as James King. Stone asked the branch manager to detain

**STATE v. WARD**

[354 N.C. 231 (2001)]

Williams while she called 9-1-1. Officer S.M. Walker of the Henderson Police Department responded to the call and arrested Williams.

Williams had been in the Dabney Drive branch of BB&T approximately ten to fifteen minutes when tellers Judy Rudd and Tammy Manning observed another black male enter the bank, look around, and leave. According to Manning, the man was driving a blue Honda and had backed the car into a space near the rear door of Bullock's of Henderson, a gift shop across the parking lot from the bank. Manning subsequently identified the man as defendant. Later that day, Brian Hobgood, an employee of Bullock's, discovered a wallet under his automobile. The identification in the wallet belonged to the victim, Patricia Smith King.

Law enforcement officers arrested defendant on 24 December 1996. In his statement to the police, defendant denied his participation in the crimes. He stated that on the day of the murder, "[he] got up at about 7:45 a.m. . . . [and] stay[ed] with [his] father and [his] wife," who was nine months pregnant.

Defendant did not put on any evidence during the guilt-innocence phase of the trial. At sentencing, he presented the testimony of several ministers who were familiar with defendant and his family. This testimony revealed that defendant attended church services regularly and that he was a self-taught musician who played the keyboard for his church and other churches as well.

Defendant's siblings also testified on defendant's behalf during the sentencing proceeding. They stated that their parents, Willie and Mary Ward, disciplined all of the children by beating them with extension cords, pool sticks, belts, and tree branches, in other words, "anything that was in their sight." This abuse resulted in severe and permanent injuries to at least one of the children—defendant's half-brother, Gerald Horton, lost a testicle when his stepfather, Willie, stamped on his groin. Indeed, all of the minor children, except defendant, either left or were removed from the home because of the abuse. A social worker with the Halifax County Department of Social Services confirmed that allegations of child abuse were filed against defendant's father. None of the allegations, however, were substantiated.

A clinical psychologist, Dr. Andrew Short, conducted a psychological evaluation of defendant following his arrest. The evaluation comprised three ninety-minute interviews of defendant and inter-

views of defendant's wife, mother, father, and defense attorney. Dr. Short found that defendant had an IQ of 68 and that he performed in the mild range of mental retardation. Dr. Short determined that defendant's mental age was between ten and eleven years. Dr. Short opined that at the time of the murder, defendant was operating under the influence of a mental and emotional disturbance and that his "capacity to understand the criminality of his actions was impaired." Dr. Short further opined that defendant's ability to conform his conduct to the requirements of the law was impaired.

## PRETRIAL ISSUES

[1] By his first two assignments of error, defendant challenges the constitutionality of the indictment charging him with first-degree murder. Prior to trial, defendant moved to dismiss the indictment on the ground that he was arbitrarily and capriciously selected for prosecution in violation of the guarantees of equal protection under the federal and state Constitutions. Defendant maintains that codefendant Settles, who planned the robbery, and codefendant Williams, who insisted that they follow through with the scheme, were similarly situated and that they were equally, if not more, responsible for the victim's murder. He argues that the State singled him out for prosecution on the charge of first-degree murder because of his mental retardation.

Under Article IV, Section 18 of the North Carolina Constitution, "[t]he District Attorney shall . . . be responsible for the prosecution on behalf of the State of all criminal actions in the Superior Courts of his district." N.C. Const. art. IV, § 18. "The clear mandate of that provision is that the responsibility and authority to prosecute all criminal actions in the superior courts is vested solely in the several District Attorneys of the State." *State v. Camacho*, 329 N.C. 589, 593, 406 S.E.2d 868, 871 (1991). The ability to be selective in determining what cases to prosecute and what charges to bring against a particular defendant is ancillary to the district attorney's prosecutorial authority. *See State v. Rorie*, 348 N.C. 266, 270, 500 S.E.2d 77, 80 (1998) (recognizing that "the district attorney has broad discretion to decide in a homicide case whether to try a defendant for first-degree murder, second-degree murder, or manslaughter"). As this Court has acknowledged, there are "no statutory or any other kind of guidelines [a prosecutor must] follow in making these decisions. Often [a prosecutor] declines to seek a first degree murder verdict and the death penalty because of a case's technical or evidentiary problems." *State*

*v. Lawson*, 310 N.C. 632, 643, 314 S.E.2d 493, 500 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

We note, however, that, at the time of defendant's trial, the prosecutor lacked the discretion to choose whether to seek the death penalty against a defendant tried for first-degree murder. *See* N.C.G.S. § 15A-2000 (1999); *Rorie*, 348 N.C. at 270-71, 500 S.E.2d at 80. If evidence of an aggravating circumstance existed, a defendant tried and convicted of first-degree murder would necessarily face a capital sentencing proceeding. *Rorie*, 348 N.C. at 271, 500 S.E.2d at 80. Recently, the legislature amended article 100 of chapter 15A of the General Statutes to include a new provision that grants the prosecutor this very discretion. Act of May 17, 2001, ch. 81, sec. 3, 2001 N.C. Sess. Laws 162, 163 (creating N.C.G.S. § 15A-2004, "Prosecutorial discretion"). Subsection (a) of the new statute pertinently provides that "[t]he State, in its discretion, may elect to try a defendant capitally or noncapitally for first degree murder, even if evidence of an aggravating circumstance exists." *Id.* This enactment became effective 1 July 2001 and was made applicable to pending and future cases. Ch. 81, sec. 4, 2001 N.C. Sess. Laws at 164. Therefore, N.C.G.S. § 15A-2004 does not apply to the case *sub judice* and has no bearing on our analysis of this issue.

The United States Supreme Court has recognized that "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles*, 368 U.S. 448, 456, 7 L. Ed. 2d 446, 453 (1962). "[T]here [must] be a showing that the selection was deliberately based upon 'an unjustifiable standard such as race, religion or other arbitrary classification.' " *State v. Cherry*, 298 N.C. 86, 103, 257 S.E.2d 551, 562 (1979) (quoting *Oyler*, 368 U.S. at 456, 7 L. Ed 2d at 453), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980), *quoted in Lawson*, 310 N.C. at 644, 314 S.E.2d at 501. Among the arbitrary classifications upon which the district attorney may not exercise his prosecutorial prerogative is "a defendant's decision to exercise his statutory or constitutional rights." *State v. Garner*, 340 N.C. 573, 588, 459 S.E.2d 718, 725 (1995), *cert. denied*, 516 U.S. 1129, 133 L. Ed. 2d 872 (1996). In order to prevail on a claim of selective prosecution, the defendant must demonstrate that his prosecution "was motivated by a discriminatory purpose and had a discriminatory effect." *Id.* (citing *Wayte v. United States*, 470 U.S. 598, 84 L. Ed. 2d 547 (1985)).

Upon careful examination of the record before us, we hold that the trial court properly denied defendant's motion to dismiss the

indictment. Defendant has presented no evidence establishing that any improper considerations influenced the district attorney's decision to prosecute him for first-degree murder. Indeed, defendant concedes that his argument on appeal is based on evidence that came to light during the trial and after the trial court denied the motion. He contends, nonetheless, that his mental retardation would have been apparent to law enforcement officers and the district attorney prior to the initiation of these proceedings against him. However, even assuming that defendant's contention is correct, there is nothing in the record to suggest that defendant's mental disability played any role in the district attorney's election to try him for first-degree murder. Therefore, defendant failed to make a threshold showing that his prosecution was motivated by a discriminatory purpose. Because defendant has not demonstrated that the indictment charging him with first-degree murder was unconstitutional, this assignment of error must fail.

[2] Defendant further contends that North Carolina's death penalty statute, N.C.G.S. § 15A-2000, is unconstitutional on its face and as applied in this case. This Court has repeatedly considered and rejected defendant's argument. *See, e.g., Garner,* 340 N.C. 573, 459 S.E.2d 718. In *Garner,* we noted that "[t]his Court has consistently recognized that a system of capital punishment is not rendered unconstitutional simply because the prosecutor is granted broad discretion." *Id.* at 588, 459 S.E.2d at 725; *accord State v. Noland,* 312 N.C. 1, 320 S.E.2d 642 (1984), *cert. denied,* 469 U.S. 1230, 84 L. Ed. 2d 369 (1985); *Lawson,* 310 N.C. 632, 314 S.E.2d 493. Because defendant offers no compelling justification for this Court to reconsider its position on this point, defendant's assignment of error is overruled.

[3] By his next assignment of error, defendant contends that the trial court erred by permitting Deputy Nelson Puckett, who was listed as a prospective witness for the State, to serve as a custodian or officer in charge of the jury. Defendant argues that although the deputy was never called to testify, prejudice is conclusively presumed, and he is deserving of a new trial. We disagree.

This Court has consistently held that a witness for the State in a criminal trial may not serve as a custodian or officer in charge of the jury. *State v. Jeune,* 332 N.C. 424, 420 S.E.2d 406 (1992); *State v. Bailey,* 307 N.C. 110, 296 S.E.2d 287 (1982); *State v. Mettrick,* 305 N.C. 383, 289 S.E.2d 354 (1982); *State v. Macon,* 276 N.C. 466, 173 S.E.2d 286 (1970). Such dual roles, we have said, give rise to a con-

clusive presumption that the defendant suffered prejudice, which would entitle him to a new trial. *Jeune*, 332 N.C. at 431, 420 S.E.2d at 410; *Bailey*, 307 N.C. at 112, 296 S.E.2d at 289; *Mettrick*, 305 N.C. at 385, 289 S.E.2d at 356; *Macon*, 276 N.C. at 473, 173 S.E.2d at 290. Further, we extended the rule to prohibit immediate family members of the prosecutor, defendant, defense counsel, or material witnesses from overseeing jurors. *State v. Wilson*, 314 N.C. 653, 336 S.E.2d 76 (1985). The rationale behind this rule is to preserve the public's confidence in the integrity of our system of justice, attendant to which is the right to trial by an impartial jury. *Jeune*, 332 N.C. at 431, 420 S.E.2d at 410; *State v. Brown*, 315 N.C. 40, 57, 337 S.E.2d 808, 822 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). This Court has observed that:

> No matter how circumspect officers who are to be witnesses for the State may be when they act as custodians or officers in charge of the jury in a criminal case, cynical minds often will leap to the conclusion that the jury has been prejudiced or tampered with in some way.

*Mettrick*, 305 N.C. at 385, 289 S.E.2d at 356.

"To determine whether the State's witness . . . acted as a custodian or officer in charge of the jury, 'we look to factual indicia of custody and control and not solely to the lawful authority to exercise such custody or control.' " *Jeune*, 332 N.C. at 431, 420 S.E.2d at 410 (quoting *Mettrick*, 305 N.C. at 386, 289 S.E.2d at 356). In *Mettrick*, this Court concluded that two witnesses for the State, a sheriff and a deputy, acted in such a capacity when they drove jurors from Caldwell County to Ashe County at the beginning of the day, to lunch during the lunch recess, and back to Caldwell County at the end of the day. In arriving at this conclusion, we deemed it significant that the jurors "were in these law enforcement officers' custody and under their charge out of the presence of the court for protracted periods of time" and that "the jurors' safety and comfort were in the officers' hands during these periods of travel." *Mettrick*, 305 N.C. at 386, 289 S.E.2d at 356.

In the instant case, the record reveals that at the outset of the proceedings, Deputy Puckett was assigned to serve, and did briefly serve, as the courtroom bailiff. Upon discovering that he was listed as a potential witness for the State, defense counsel informed the trial court, who promptly replaced Deputy Puckett with another bailiff.

The record indicates, however, that after the jury was selected, the trial court called on Officer Puckett to coordinate the panel's transportation from Nash County to Halifax County, where the trial was held. While it is not clear from the record whether Deputy Puckett himself served as a driver or accompanied the jurors to and from the Halifax County courthouse, it is apparent that he was responsible for securing the drivers and for ensuring that the jurors arrived at the point of departure on time. Therefore, we conclude that as in *Mettrick*, there is sufficient "factual indicia of custody and control" to establish that he was, indeed, a custodian or officer in charge of the jury.

The record further reveals, and defendant concedes, that Deputy Puckett ultimately did not give testimony as a witness in this case. Nonetheless, defendant urges us to hold that prejudice to him is conclusively presumed, since the deputy had personal knowledge of facts relevant to the case, and Deputy Puckett's name surfaced during the course of the State's evidence. We decline to so hold because the mere mention of his name during the testimony of a State's witness does nothing to impugn the integrity of our jury system. These circumstances are not such as would "lead people to believe the jury may have been improperly influenced." *Brown*, 315 N.C. at 57-58, 337 S.E.2d at 822. Accordingly, prejudice cannot be conclusively presumed. Moreover, since defendant has made no showing of any actual prejudice, we overrule this assignment of error.

[4] We next consider defendant's argument that the trial court erroneously denied his motion for a mistrial after he was led by a deputy sheriff into the courtroom, wearing handcuffs in view of prospective jurors. Defendant contends that the trial court manifestly abused its discretion by failing to conduct a formal inquiry to determine whether the incident tainted defendant in the minds of the jurors and in failing to undertake adequate remedial measures to cure any prejudice defendant may have suffered. We must disagree.

N.C.G.S. § 15A-1061 provides that the trial court "must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (1999). "A mistrial should be granted only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair

and impartial verdict." *State v. Laws*, 325 N.C. 81, 105, 381 S.E.2d 609, 623 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *and quoted in State v. Bonney*, 329 N.C. 61, 73, 405 S.E.2d 145, 152 (1991). Whether to allow a motion for mistrial is a decision committed to the sound discretion of the trial court, and its decision in this regard will not be overturned on appeal unless an abuse of that discretion is established. *State v. Johnson*, 341 N.C. 104, 114, 459 S.E.2d 246, 252 (1995).

Generally, "a defendant is entitled to appear in court free from all bonds and shackles." *State v. Perry*, 316 N.C. 87, 108, 340 S.E.2d 450, 463 (1986). However, the trial court may, in the exercise of its discretion, require an accused to be physically restrained during his trial "when it is necessary to prevent escape, to protect others in the courtroom, or to maintain an orderly trial." *Id.* Nonetheless, physical restraint that denies the defendant a fair trial is prohibited by the due process guarantees of the federal and state Constitutions. *State v. Tolley*, 290 N.C. 349, 226 S.E.2d 353 (1976).

After examining the record in this case, we conclude that the incident, although regrettable, did not result in any actual prejudice to defendant. The record reveals that all, or nearly all, of the prospective jurors summoned for duty were seated in the spectator section of the courtroom when defendant was escorted into the courtroom wearing handcuffs. Defendant entered through a door to the right of the trial judge's entrance and was in a position to be seen by all of the prospective jurors. The record further shows that defendant moved no more than five or six feet into the courtroom when defense counsel noticed his appearance and approached the deputy about the problem. The deputy then immediately seated defendant and removed the handcuffs.

During his argument on the motion, defense counsel stated that, under the circumstances, any number of prospective jurors could have seen defendant in the restraints. The trial judge, who was not present in the courtroom when the incident occurred, acknowledged the possibility that defendant was observed, but denied the motion without further inquiry into the matter.

Defendant, relying on this Court's decision in *Johnson*, 341 N.C. 104, 459 S.E.2d 246, argues that the trial court was required to conduct a *voir dire* of the prospective jurors to determine whether they had witnessed defendant in handcuffs and to give curative instructions to remove any prejudice. In *Johnson*, this Court found that the

trial court committed no abuse of discretion in denying the defendant's motion for a mistrial after jurors witnessed him being escorted through the courtroom in handcuffs and shackles. The record in that case revealed that, upon the defendant's motion, the trial court conducted an extensive *voir dire* of the jurors, concluded that they had seen the defendant in restraints, gave repeated curative instructions, and further inquired as to whether the jurors had been prejudiced by what they had observed. In response to the court's inquiry, all of the jurors indicated that they could be fair and follow the trial court's instructions.

Contrary to defendant's contention, our decision in *Johnson* should not be construed to require the trial court to undertake a *voir dire* of an entire panel of prospective jurors whenever there is a possibility that one or more members of the panel observed the defendant in restraints. Rather, the crux of the holding was that the defendant, based on an examination of the record, suffered no " 'substantial and irreparable prejudice.' " *Id.* at 116, 459 S.E.2d at 252-53 (quoting N.C.G.S. § 15A-1061). We hold similarly in the instant case. The record reveals that defendant was not handcuffed during the course of the trial. Moreover, we note that the entire incident transpired within a matter of seconds and that the jurors could have seen no more than a glimpse of defendant's wrists in the handcuffs. Therefore, we believe that the trial court's decision not to conduct an inquiry, and thereby draw unwanted attention to the fact that defendant had been handcuffed, was a reasoned one.

As to defendant's claim of prejudice, we note that he has not shown that he lost favor with any of the jurors as a result of the restraints. Indeed, we are satisfied that no such prejudice occurred, since the jurors actually chosen to serve were repeatedly instructed that defendant was presumed innocent and that they were to base their decision solely on the evidence presented at trial. "Jurors are presumed to follow the instructions given to them by the court." *Id.* at 115, 459 S.E.2d at 252. Accordingly, we hold that the trial court properly denied defendant's motion for a mistrial.

[5] Defendant further complains that the trial court erred in denying his pretrial motion for disclosure of jury information known to the State. Defendant argues that the State's vast investigative resources enabled it to compile information concerning the prospective jurors' previous jury service and the verdicts rendered by the juries on which they served. Defendant contends that this information was

unattainable to him and, as a result, placed him at a disadvantage when questioning prospective jurors. The trial court's decision to deny the motion for disclosure, defendant argues, improperly deprived him of the "basic tools of an adequate defense." *Britt v. North Carolina*, 404 U.S. 226, 227, 30 L. Ed. 2d 400, 403 (1971). However, personal information about prospective jurors is not subject to disclosure by the State. *See* N.C.G.S. § 15A-903 (1999) (governing disclosure of evidence by the State). There has been no violation of defendant's discovery rights under N.C.G.S. § 15A-903; thus, his assignment of error is without merit.

## JURY SELECTION

[6] By another assignment of error, defendant contends that the trial court erred in allowing the prosecutor to question prospective jurors in a manner that infringed upon his Fifth Amendment right to remain silent and to refrain from testifying at trial. Defendant did not object to the prosecutor's remarks, but argues that the trial court committed reversible error by failing to intervene *ex mero motu* to control the improper *voir dire*. We cannot agree.

A defendant who fails to interpose an objection at trial to statements made by the prosecutor must demonstrate on appeal "that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*." *State v. Mitchell*, 353 N.C. 309, 324, 543 S.E.2d 830, 839 (2001). " 'To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.' " *Id.* (quoting *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999)). Furthermore, "the comments must be viewed in the context in which they were made and in light of the overall factual circumstances to which they referred." *State v. Call*, 349 N.C. 382, 420, 508 S.E.2d 496, 519 (1998).

In our legal system, it is axiomatic that a criminal defendant is entitled under the Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, to remain silent and to refuse to testify. *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106 (1965). This right is also guaranteed under Article I, Section 23 of the North Carolina Constitution. *State v. Reid*, 334 N.C. 551, 554, 434 S.E.2d 193, 196 (1993). It is equally well settled that when a defendant exercises his right to silence, it "shall not create any presumption against him," N.C.G.S. § 8-54 (1999), and any

comment by counsel on a defendant's failure to testify is improper and is violative of his Fifth Amendment right, *Mitchell*, 353 N.C. at 326, 543 S.E.2d at 840.

> "The reason for the rule is that *extended comment* from the court or from counsel for the state or defendant would tend to nullify the declared policy of the law that the failure of one charged with crime to testify in his own behalf should not create a presumption against him or be regarded as a circumstance indicative of guilt or unduly accentuate the significance of his silence. . . .

> "While the mere statement by . . . counsel that the law says no man has to take the witness stand *would seem unobjectionable*, it is obvious that further comment or explanation might [be] violative of the rule established by the decisions of this Court."

*State v. Banks*, 322 N.C. 753, 763, 370 S.E.2d 398, 405 (1988) (quoting *State v. Bovender*, 233 N.C. 683, 689-90, 65 S.E.2d 323, 329-30 (1951), *overruled on other grounds by State v. Barnes*, 324 N.C. 539, 380 S.E.2d 118 (1989)) (first and fourth alterations in original).

Nevertheless, a comment implicating a defendant's right to remain silent, although erroneous, is not invariably prejudicial. *Mitchell*, 353 N.C. at 326, 543 S.E.2d at 841. Indeed, such error will not earn the defendant a new trial if, after examining the entire record, this Court determines that the error was harmless beyond a reasonable doubt. *Id.*; N.C.G.S. § 15A-1443(b) (1999).

During the *voir dire* of prospective jurors, the prosecutor questioned several members of the venire as to whether they understood defendant's right to refuse to put on evidence or to testify in his defense. In so doing, the prosecutor employed multiple versions of the following query:

> In addition to his decision, choice, privilege, whatever, to put on evidence, the defendant may also testify, put his hand on the Bible and testify. Again, that's his choice. Nobody can make him do it. He can do it if he wants to. If he doesn't want to he doesn't have to. Okay? Is there anything about that that bothers you, about whether or not he puts on evidence or whether or not he testifies? You understand that's his decision?

The record indicates that the prosecutor posed this question to at least sixteen of the prospective jurors.

Defendant contends that the prosecutor's remarks were, in essence, advance comments on his failure to take the stand. He argues that the problem with these comments is the prosecutor's reference to the Bible and the manner in which he juxtaposed defendant's choice not to testify against his ability to place his hand on the Bible. Defendant asserts that the prosecutor's statements violated his Fifth Amendment right to remain silent and warranted the trial court's intervention *ex mero motu*.

Viewing the prosecutor's remarks in the context in which they were made, we hold that they were not impermissible anticipatory comments on defendant's decision not to testify. Here, the prosecutor merely informed prospective jurors of the nature of defendant's right and described the testimonial process. Granted, the jurors could have taken the prosecutor's statements to mean that whether defendant chose to testify would depend on whether he could, in good conscience, place his hand on the Bible and swear to tell the truth. Certainly, repeated statements to this effect could very well plant such a notion in the minds of the jurors. However, that was not the case here. Pursuant to defendant's motion, the prospective jurors were sequestered, and *voir dire* was conducted individually. Thus, the instant facts do not present the sort of repetitious or "extended comment" or "explanation" that this Court would find objectionable. *See Banks*, 322 N.C. at 763, 370 S.E.2d at 405. However, we caution that comments concerning a defendant's right not to testify will be closely scrutinized by this Court.

Assuming, *arguendo*, that the prosecutor's statements crossed constitutional boundaries, we conclude that the error was harmless beyond a reasonable doubt. Regarding defendant's election not to testify, the trial court instructed the jury as follows:

The defendant in this case has not testified. The law of North Carolina gives him this privilege. This same law also assures him that his decision not to testify creates no presumption against him. Therefore, his silence is not to influence your decision in any way.

This instruction cured any error that may have arisen by way of the trial court's failure to intervene *ex mero motu* and restrain the prosecutor's remarks. Given the overwhelming evidence of defendant's guilt and the curative instruction, defendant suffered no prejudice.

**[7]** Further, defendant contends that the trial court erred in failing to intervene *ex mero motu* to prevent the prosecutor from indoctrinating prospective jurors during *voir dire*. He argues that the prosecutor was permitted to instruct prospective jurors as to the manner in which they should respond to imminent questions from defense counsel under *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992). Allowing the alleged improper inquiry, defendant contends, violated his rights to due process and to a fair and impartial jury. We disagree.

"The goal of jury selection is to ensure that a fair and impartial jury is empaneled." *State v. Gell*, 351 N.C. 192, 200, 524 S.E.2d 332, 338, *cert. denied*, 531 U.S. 867, 148 L. Ed. 2d 110 (2000). To that end, the trial court is vested with broad discretion to regulate the extent and manner of questioning by counsel during *voir dire*. *Id*. In order to demonstrate reversible error in this respect, the defendant must show that the trial court committed a clear abuse of discretion and that the defendant was prejudiced thereby. *State v. Meyer*, 353 N.C. 92, 110, 540 S.E.2d 1, 12 (2000), *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 54, 70 U.S.L.W. 3235 (2001).

As regards the permissible scope of questioning during *voir dire*, this Court has said that:

"Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts. In the first place, such questions are confusing to the average juror who at that stage of the trial has heard no evidence and has not been instructed on the applicable law. More importantly, such questions tend to 'stake out' the juror and cause him to pledge himself to a future course of action. This the law neither contemplates nor permits. The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts."

*State v. Jones*, 347 N.C. 193, 202, 491 S.E.2d 641, 647 (1997) (quoting *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976)). Equally improper are efforts by counsel "to indoctrinate, visit with or establish 'rapport' with jurors." *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980).

In the present case, the prosecutor questioned one prospective juror in the following manner:

Q. Okay. Now, upon determining the defendant's guilt in the non-capital cases, you understand the Judge would sentence him, okay? Upon determining the defendant's guilt in the first degree murder case, then that's when we go into the second phase, the sentencing phase.

A. Right

Q. Okay? So you may be asked this question so let me go ahead and deal with it now, okay, because if it's not a trick question, it's a tricky question, okay? And it's if the State convinced you beyond a reasonable doubt that the defendant was guilty of murder and you had returned that verdict of guilty, do you think at that time, now, see, when I say at that time, I'm talking about at the end of the guilt phase, okay? When you shouldn't be considering punishment.

A. Right.

Q. Okay. Second tricky question. If you sat on the jury and returned the verdict of guilty of first degree murder, would you then presume that the penalty should be death?

A. Unt-uh.

Q. Well, see if you didn't get the trick to that question you might say well, why are they talking about this at that time and then, see? These questions are all aimed at the end of the guilt phase.

A. Right.

Q. To see if you are ahead of yourself. You see what I mean?

A. Right.

The prosecutor asked similar questions of five other prospective jurors, two of whom ultimately sat on the jury and decided defendant's fate. Defendant made no objections to this line of questioning during *voir dire*.

"In reviewing any jury *voir dire* questions, this Court examines the entire record of the *voir dire*, rather than isolated questions." *Jones*, 347 N.C. at 203, 491 S.E.2d at 647. Having done so, we hold that

the trial court did not abuse its discretion in permitting the prosecutor to question prospective jurors in the challenged manner. The questions were designed to determine whether the jurors would refrain from considering punishment until such time, if at all, as they reached the sentencing proceeding. The prosecutor did not question jurors as to how they would vote, nor did he instruct them on how they should vote, under a given set of facts. Furthermore, he did not misstate the law. He merely endeavored to determine whether the prospective jurors could follow the law and serve as fair and impartial decisionmakers. This, indeed, is the very purpose of *voir dire*. Defendant's assignment of error, therefore, must fail.

[8] By his next assignment of error, defendant contends that the trial court improperly restricted his *voir dire* of prospective jurors in violation of his federal and state constitutional rights. It is well established that "[t]he trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled." *State v. Conaway*, 339 N.C. 487, 508, 453 S.E.2d 824, 837-38, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995). Furthermore, although counsel is entitled to "diligently inquire into a juror's fitness to serve, the extent and manner of that inquiry rests within the trial court's discretion." *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989). We have said that "[o]n the *voir dire* . . . of prospective jurors, hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed." *Vinson*, 287 N.C. at 336, 215 S.E.2d at 68. To demonstrate reversible error in the jury selection process, the defendant must show a manifest abuse of the court's discretion and prejudice resulting therefrom. *Parks*, 324 N.C. at 423, 378 S.E.2d at 787.

Defendant first contends that, in violation of *Morgan*, 504 U.S. 719, 119 L. Ed. 2d 492, the trial court prevented him from questioning several prospective jurors as to whether they believed that the death penalty would be the only appropriate punishment if they found defendant guilty of first-degree murder. Under *Morgan*, "a defendant in a capital trial must be allowed to make inquiry as to whether a particular juror would automatically vote for the death penalty." *State v. Robinson*, 336 N.C. 78, 102, 443 S.E.2d 306, 317 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The record reveals, however, that defendant was able to establish through a series of questions that the prospective jurors at issue could fairly consider a sentence of life imprisonment as a possible punishment. Additionally, the record shows that the trial court sustained objections to the form of

the challenged questions, but permitted defense counsel to rephrase the questions and obtain the jurors' responses. Thus, we hold that the trial court committed no abuse of its discretionary authority.

**[9]** Defendant further argues that the trial court precluded him from asking follow-up questions of jurors that would have helped counsel understand the jurors' beliefs about the death penalty. Contrary to defendant's contention, however, the record demonstrates that defense counsel was allowed to conduct an exhaustive examination into the prospective jurors' attitudes about the death penalty and whether those attitudes would interfere with their ability to serve. Therefore, on this point, we find no abuse of the trial court's discretion.

**[10]** Lastly, defendant contends that the trial court improperly limited questions designed to determine whether the members of the venire understood that defendant had no burden to put on evidence. Again, after carefully examining the transcript of the *voir dire*, we are satisfied that the trial court did not abuse its discretion. Furthermore, defendant has not made any showing of prejudice resulting from the allegedly erroneous rulings. Accordingly, we overrule defendant's assignment of error.

**[11]** By another assignment of error, defendant argues that the trial court erred in excusing several prospective jurors for cause based on their views about the death penalty. He contends that the trial court asked each juror a series of leading questions phrased in such a manner as to elicit answers expressing opposition to the death penalty. Further, he contends that these jurors' responses to inquiries about their views on the death penalty were equivocal and that defense counsel should have been afforded an opportunity to question and rehabilitate each of the challenged jurors. Again, we disagree.

The test for determining whether a prospective juror's views on capital punishment may properly serve as the basis of a challenge for cause is whether such views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *State v. Syriani*, 333 N.C. 350, 369, 428 S.E.2d 118, 128 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985)), *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993); *accord State v. Davis*, 325 N.C. 607, 621-22, 386 S.E.2d 418, 425 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990). A juror may not be excused for cause merely for "voic[ing] general objections to the death penalty or express[ing] conscientious or reli-

gious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 785 (1968). Bias against the death penalty is seldom established with "unmistakable clarity," and in instances where a juror's opposition to the death penalty is not explicit, "reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *Davis*, 325 N.C. at 624, 386 S.E.2d at 426. As the United States Supreme Court has noted,

> many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where a trial judge is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Wainwright*, 469 U.S. at 424-26, 83 L. Ed. 2d at 852-53 (footnote omitted).

The trial court asked each of the prospective jurors challenged by the prosecution a sequence of questions in an attempt to clarify each juror's position on the death penalty. The following exchange between the trial court and prospective juror Green is representative of the nature and extent of the trial court's examination of each member of the venire defendant contends was erroneously excused for cause:

> THE COURT: I just want to be sure I heard your responses to Mr. Caudle's [the prosecutor's] questions so I'm on solid ground. Okay?
>
> MS. GREEN: Yes, sir.
>
> THE COURT: I asked you a number of questions in a different form than he asked you and you gave me a different response. Okay?
>
> MS. GREEN: Yes, sir.
>
> THE COURT: Have you had time to reflect more about my questions now so if I ask you the same questions again—I think you told me a moment ago that you'd be able to follow the law and consider both possible punishments, life imprisonment and

**STATE v. WARD**

[354 N.C. 231 (2001)]

death as possible punishments. You indicated to me when I questioned you that you could, is that right?

Ms. GREEN: Yes, sir.

THE COURT: All right. Now, a moment ago, when Mr. Caudle questioned you, you turned it around and said no, you couldn't do that, is that right? So, you've given me conflicting responses and I need to know for myself where you are. Okay?

Ms. GREEN: Okay.

THE COURT: The question, quite simply, is this. Is there any sort of circumstances you could think of, in any case, ma'am, where you could impose a sentence of death?

Ms. GREEN: That I could impose on death?

THE COURT: If you were sitting on a jury, is there any circumstance you could think of, any case, any set of facts you could think of, where you'd be able to impose a sentence of death?

Ms. GREEN: No, sir.

THE COURT: Okay. Is there any set of circumstances, if you were sitting on a jury, where you could think of a case where you might impose a sentence of life imprisonment?

Ms. GREEN: Yes, I would.

THE COURT: Okay. So you have no problem with imposing a punishment of life imprisonment . . .

Ms. GREEN: (Interjected) No, I do not.

THE COURT: But you would be unable under any circumstances that you could think of, [to] impose a sentence of death at any time.

Ms. GREEN: Yes, sir.

THE COURT: Okay. So I take it then that between the time I questioned you and Mr. Caudle questioned you that you really thought a little more about these questions and this is now your answer at this point?

Ms. GREEN: Yes, sir.

THE COURT: This is what you believe?

Ms. Green: Yes, sir.

The Court: So it's not a flip-flop. It's just that you've thought about it and this is what you think?

Ms. Green: Yes, sir.

Defendant argues that Ms. Green's responses—and the similar responses given by eighteen additional prospective jurors challenged for cause—were, at best, ambivalent. While it is true that many of the jurors so challenged were unable to articulate their biases against capital punishment clearly, their responses revealed either that they were predisposed to render a life sentence or that they could not envision any circumstances under which they could impose a sentence of death. This notwithstanding, defendant contends that further examination by defense counsel would have demonstrated each juror's fitness to serve on the jury. However, we have said that

[w]hen challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged [about the matter further].

*State v. Oliver*, 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981). Defendant has not shown that further questioning by defense counsel would likely have yielded different responses from the challenged jurors. Although the prospective jurors, at times, gave conflicting responses, at the heart of their answers were strong reservations about capital punishment that would substantially impair their abilities to fulfill their duties as jurors.

Moreover, we find no impropriety in the manner in which the trial court questioned the prospective jurors about their views. The questions were intended to extract definitive responses from the prospective jurors so that the trial court could fully and fairly assess the State's challenges for cause. Therefore, we conclude that the trial court committed no abuse of discretion and overrule this assignment of error.

## GUILT-INNOCENCE PHASE

By further assignments of error, defendant contends that the trial court improperly limited his cross-examination of three witnesses for

the State, in violation of his Sixth Amendment right to confront the witnesses against him.

Under the Confrontation Clause of the Sixth Amendment to the United States Constitution, an accused is guaranteed the right to be confronted with his adverse witnesses. *State v. McNeil*, 350 N.C. 657, 677, 518 S.E.2d 486, 498 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000). "The principal purpose of confrontation is to secure to the defendant the right to test the evidence of the witnesses against him through cross-examination." *State v. Mason*, 315 N.C. 724, 729, 340 S.E.2d 430, 434 (1986). This right, however, is not without limits, and the trial court "retain[s] broad discretion to preclude cross-examination that is repetitive or that is intended to merely harass, annoy or humiliate a witness." *Id.* at 730, 340 S.E.2d at 434.

[12] Defendant initially complains that the trial court would not permit him to cross-examine Captain C.E. Ward of the Halifax Sheriff's Department about the contents of an SBI report unless defendant first introduced the report into evidence. The record reveals that defense counsel began his cross-examination by asking Captain Ward whether he had copies of the SBI reports with him. When Captain Ward responded affirmatively, defense counsel proceeded to direct the witness to a specific page of the report. At this point, the prosecutor objected, arguing that the document must be admitted into evidence if the defense intended to cross-examine the witness concerning its contents. Defense counsel responded, stating:

> I don't intend to introduce it. I'm just gonna ask him questions about it. If he wants to look at it, I'll ask him without him looking at it, but if he wants to look at it [to refresh his memory], I'm giving him notice to look at it, I'm not seeking him to introduce it.

The trial court then admonished defense counsel to refrain from specific references to the SBI report, but indicated that counsel was free to direct the witness to refer to the report to refresh his recollection.

The record reveals that throughout the defense's cross-examination, Captain Ward repeatedly stated that he could not answer questions concerning the results of the forensic analysis performed on several pieces of evidence "[w]ithout looking at [the SBI] report." Defense counsel, although permitted by the trial court to do so, never

instructed the witness to refer to the report for purposes of refreshing his recollection. Therefore, we find no merit in defendant's contention that the trial court improperly limited his cross-examination of Captain Ward, and this argument is overruled.

[13] Defendant further argues that the trial court prevented him from effectively cross-examining codefendants Williams and Settles about the events that took place on the day of the murder and about their respective plea arrangements. However, defendant's argument does not bear up under our examination of the record. Defense counsel was permitted to cross-examine each of the codefendants at great length. In those instances where the trial court sustained the prosecutor's objections to defense counsel's questions, the questions called for incompetent hearsay testimony, were unduly repetitive or argumentative, or were simply improper in form. Accordingly, the limits placed by the trial court on defendant's cross-examination of these witnesses was an appropriate exercise of its discretion. Defendant's assignments of error then must fail.

[14] By another assignment of error, defendant complains that the trial court improperly permitted the prosecutor to argue to the jury that defendant had a responsibility to put on evidence.

This Court has firmly established that "[t]he scope of jury arguments is left largely to the control and discretion of the trial court, and trial counsel will be granted wide latitude in the argument of hotly contested cases." *Call*, 349 N.C. at 419, 508 S.E.2d at 519. The evidence presented and all inferences reasonably drawn from the evidence are within the scope of permissible argument. *Id.* Furthermore, "[w]here, as here, defendant failed to object to any of the closing remarks of which he now complains, he must show that the remarks were so grossly improper that the trial court erred by failing to intervene *ex mero motu.*" *Id.* at 419-20, 508 S.E.2d at 519.

Defendant takes issue with that portion of the prosecutor's argument pointing out that defendant had the power to subpoena witnesses to refute the State's evidence but failed to do so. Specifically, the prosecutor stated:

And this evidence that you've heard over these three weeks, these eighty-two pieces of evidence and thirty-four witnesses, there is not a first one that has been refuted.

STATE v. WARD

[354 N.C. 231 (2001)]

The defendant has the same power of subpoena as the State. The defendant can call any witness that he chooses to refute any item of evidence. And ladies and gentlemen, it's a short walk from here to this witness stand up here (indicated), and you have not heard one witness, not one piece of evidence to refute the truth.

. . . [N]ot one ounce, not one shred, not one piece of evidence, not one word of testimony refutes the State's case here. . . . This defendant has not called a single witness. Where is Felicia Ward to say well, wait a minute, wait a minute, Craig Williams went to Richmond, I didn't go with him. . . . Where is the defendant's father to say wait a minute now, Ken Settles never came by on the Friday after the murder to talk to my son. . . . So if you hear . . . this afternoon, why didn't the State do this or why didn't the State do that, why didn't the State call this witness or that witness, you ought to be asking yourself, why didn't you call them? Why didn't you call them? Because they got the same power to do it. If it's something wrong, or if somebody's told something wrong, or if there's some error here, you straighten it out, you've got the power, straighten it out, but don't whine about what the State didn't do. Fix it yourself.

Defendant contends that because he is the only witness who could have refuted the relevant evidence, this argument amounted to an improper comment on his failure to testify. Having carefully examined the prosecutor's argument, however, we find no merit to this contention. The prosecutor never directly commented on defendant's failure to testify, nor did he suggest that defendant should have taken the stand to refute the State's evidence. "This Court has repeatedly held that a prosecutor may properly comment on a defendant's failure to produce witnesses or evidence that contradicts or refutes evidence presented by the State." *Id.* at 421-22, 508 S.E.2d at 520. Accordingly, we find no gross improprieties in the prosecutor's argument deserving of *ex mero motu* intervention by the trial court.

[15] Defendant further argues that during the prosecutor's redirect examination of Captain Ward of the Halifax Sheriff's Department, the prosecutor improperly placed the burden on defendant to produce evidence to prove his innocence. On cross-examination by defense counsel, Captain Ward testified that certain forensic tests had been performed on the evidence. On redirect, the prosecutor asked Captain Ward whether defendant's attorneys had taken it upon them-

selves to have any of the relevant evidence tested or inspected. This line of questioning, defendant contends, was inappropriate.

However, defendant waived appellate review of this issue by failing to object to the prosecutor's questions at trial. "In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(b)(1). Furthermore, we note that defendant did not assert in this assignment of error that the prosecutor's questions warranted the trial court's intervention *ex mero motu*. Defendant's argument, therefore, is not properly before this Court. *See* N.C. R. App. P. 10(c)(4); *State v. Frye*, 341 N.C. 470, 496, 461 S.E.2d 664, 677 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

[16] By an additional assignment of error, defendant contends that the trial court erred in failing to instruct the jurors at every recess regarding their conduct and duties in accordance with N.C.G.S. § 15A-1236. Defendant acknowledges, however, that he did not object to the trial court's failure to give the necessary instructions. Further, we note that while defendant argues plain error in his brief, he failed to include plain error as an alternative in his assignment of error in the record on appeal. Therefore, defendant has not properly preserved this argument for our review. *See* N.C. R. App. P. 10(c)(4) (providing that "a question which was not preserved by objection noted at trial . . . nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error"); *State v. Thibodeaux*, 341 N.C. 53, 62, 459 S.E.2d 501, 507 (1995) (stating that "defendant must object to any failure of the trial court to give the required admonitions to the jury in order to preserve this issue for appeal").

[17] Defendant's next assignment of error concerns the denial of his motion *in limine* to bar the testimony of a well-known criminal defense attorney, Gilbert Chichester, and his staff. Defendant argues that the testimony was inadmissible under North Carolina Evidence Rule 401. Alternatively, he contends that the testimony was substantially more prejudicial than probative and should have been excluded under Rule 403. We cannot agree.

Rule 401 of the North Carolina Rules of Evidence defines "relevant evidence" as that which has "any tendency to make the exist-

ence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). "We have interpreted Rule 401 broadly and have explained on a number of occasions that in a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible." *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994).

Under Rule 403, relevant evidence may be excluded, however, if the trial court determines that "its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1999). Evidence that is probative of the State's theory of the case will necessarily be prejudicial to the defendant. *State v. Weathers*, 339 N.C. 441, 449, 451 S.E.2d 266, 270 (1994). "[T]he question is one of degree." *Id.* " 'Unfair prejudice,' as used in Rule 403, means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one.' " *State v. DeLeonardo*, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986) (quoting N.C.G.S. § 8C-1, Rule 403 official commentary (Supp. 1985)). Whether to exclude relevant evidence pursuant to Rule 403 is a decision within the trial court's discretion and will remain undisturbed on appeal absent a showing that an abuse of discretion occurred. *State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Hayes*, 314 N.C. 460, 471, 334 S.E.2d 741, 747 (1985).

In the case *sub judice*, attorney Chichester and members of his staff were called to testify that defendant met with Chichester at approximately 10:00 a.m. on the morning of 18 December 1996. This evidence was offered to corroborate the testimony of codefendant Williams, a key witness for the State, as to the events leading up to the murder. As such, the evidence was relevant and admissible. Furthermore, defendant has not demonstrated that the jury's verdict was based on any unfair prejudice resulting from attorney Chichester's appearance on the witness stand. Accordingly, we detect no abuse of discretion in the trial court's decision to allow the testimony, and defendant's assignment of error fails.

## SENTENCING PROCEEDING

**[18]** By assignment of error, defendant contends that, during sentencing arguments to the jury, the prosecutor improperly commented

on defendant's invocation of his constitutional right to remain silent. Defendant did not object to the prosecutor's remarks. Nonetheless, he argues that the trial court's failure to intervene *ex mero motu* to control the prosecutor's argument rendered the proceedings fundamentally unfair.

"As a general rule, counsel is allowed wide latitude in the jury argument during the capital sentencing proceeding." *State v. Smith*, 351 N.C. 251, 268, 524 S.E.2d 28, 41, *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100 (2000). Accordingly, counsel is entitled to argue all of the evidence presented at trial and all reasonable inferences drawn therefrom. *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999). Whether counsel exceeded the latitude afforded him "is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there [was] such gross impropriety in the argument as [was] likely to [have] influence[d] the verdict of the jury." *State v. Covington*, 290 N.C. 313, 328, 226 S.E.2d 629, 640 (1976)).

Where, as in this case, the defendant failed to object to the prosecutor's comments during the closing argument, the question for this Court is "whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu.*" *State v. Call*, 353 N.C. 400, 416-17, 545 S.E.2d 190, 201 (2001). We recognize that "the prosecutor in a capital case has a duty to strenuously pursue the goal of persuading the jury that the facts of the particular case at hand warrant imposition of the death penalty." *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Therefore, "only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996). Furthermore, statements made during closing arguments will not be examined in isolation. *Guevara*, 349 N.C. at 257, 506 S.E.2d at 721. " 'Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred.' " *Id.* (quoting *Green*, 336 N.C. at 188, 443 S.E.2d at 41).

In the instant case, the prosecutor argued the following regarding defendant's post-arrest silence while at Dorothea Dix Hospital:

> He started out that he was with his wife and child or wife and children or something that morning. We know he could talk, but he decided just to sit quietly. He didn't want to say anything that would "incriminate himself." So he appreciated the criminality of his conduct all right.

> He was mighty careful with who [sic] he would discuss that criminality, wasn't he? He wouldn't discuss it with the people at Dix.

It is well established that a criminal defendant has a right to remain silent under the Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, and under Article I, Section 23 of the North Carolina Constitution. *Mitchell*, 353 N.C. at 326, 543 S.E.2d at 840. A defendant's decision to remain silent following his arrest may not be used to infer his guilt, and any comment by the prosecutor on the defendant's exercise of his right to silence is unconstitutional. *Id.* "A statement that may be interpreted as commenting on a defendant's decision [to remain silent] is improper if the jury would naturally and necessarily understand the statement to be a comment on the [exercise of his right to silence.]" *Id.* at 326, 543 S.E.2d at 840-41.

Applying these principles to the argument in question, we hold that the prosecutor impermissibly commented on defendant's silence in violation of his rights under the state and federal Constitutions. As we noted in *Mitchell*,

> district attorneys and assistant district attorneys have a duty as officers of the court and as advocates for the people to conduct trials in accordance with due process and the fair administration of justice and should thus refrain from arguments that unnecessarily risk being violative of a defendant's fundamental constitutional rights, thereby necessitating new trials.

*Id.* at 326-27, 543 S.E.2d at 841. Hence, the trial court's failure to intervene *ex mero motu* amounted to an abuse of discretion. Because we cannot conclude that this omission had no impact on the jury's sentencing recommendation, we set aside the sentence of death and remand for a new capital sentencing proceeding.

**STATE v. WARD**

[354 N.C. 231 (2001)]

In light of our decision granting defendant a new sentencing hearing, we need not reach defendant's remaining assignments of error, as they are not likely to recur on remand.

We conclude that defendant received a fair trial, free from prejudicial error. However, because we find prejudicial error in the capital sentencing proceeding, we remand this case to the Superior Court, Halifax County, for a new sentencing proceeding on the first-degree murder conviction.

NO ERROR IN GUILT PHASE; DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

Chief Justice LAKE dissenting in part.

I concur in the majority opinion regarding the issues of guilt/innocence, but I respectfully dissent as to that portion of the opinion regarding the necessity for a new capital sentencing proceeding.

I do not agree with the majority's conclusion that the prosecutor's argument to the jury during the sentencing phase of the instant case was so grossly improper as to require the trial court to intervene *ex mero motu*. The majority points out that defendant did not object to the prosecutor's remarks. As this Court has observed many times, "only an *extreme impropriety* on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693 (emphasis added), *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996), *quoted in State v. Cummings*, 353 N.C. 281, 297, 543 S.E.2d 849, 859, *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 286 (2001). The prosecutor's remarks, under the circumstances and in the context here given, do not rise to the level of an "extreme impropriety."

Taken in context, I do not believe that this closing argument during the capital sentencing proceeding was an improper comment on defendant's silence, in violation of his rights under the federal and state Constitutions. Defendant's guilt had already been established during trial. The prosecutor was not alluding to the trial, and he neither referenced defendant's failure to testify nor encouraged the jurors to utilize defendant's silence as an aggravating circumstance.

Rather, the entire context of this portion of the argument referred to defendant's conduct during his evaluation at Dorothea Dix Hospital. The prosecutor's remarks were intended to draw the jury's attention to testimony, which was admitted into evidence, that defendant spoke little to the doctors at the hospital, thereby raising at least the arguable inference that defendant did understand the nature of his circumstances and did, in fact, appreciate the criminality of his conduct. It is well settled that counsel may argue all evidence which has been presented as well as reasonable inferences which arise therefrom. *State v. McNeil*, 350 N.C. 657, 685, 518 S.E.2d 486, 503 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000).

In arguing that defendant "appreciated the criminality of his conduct" and "was mighty careful with who [sic] he would discuss that criminality," the prosecutor could only have been referencing and arguing against the (f)(6) mitigating circumstance. This portion of the argument was therefore intended to directly refute the (f)(6) mitigating circumstance sought by defendant. *See* N.C.G.S. § 15A-2000(f)(6) (1999). "[O]ur capital punishment statute provides that, during the sentencing phase, evidence may be presented 'as to any matter that the court deems relevant to sentence,' including matters relating to mitigating circumstances." *State v. Locklear*, 349 N.C. 118, 158, 505 S.E.2d 277, 300 (1998) (quoting N.C.G.S. § 15A-2000(a)(3) (1997)), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). As such, the argument was clearly relating to evidence before the court and to a mitigating circumstance subject to consideration by the jury. The argument was therefore proper and in any event was not subject to *ex mero motu* intervention.

Justice WAINWRIGHT joins in this dissenting opinion.