STATE OF NORTH CAROLINA v. JAMES FRANK EZZELL

No. COA06-624

(Filed 3 April 2007)

**1. Confessions and Incriminating Statements— right to silence—first waived, then invoked—cross-examination**

There was no prejudicial error in a second-degree murder prosecution from a cross-examination about a statement made by defendant after waiving his Miranda rights at the arrest scene even though he later asserted his right to remain silent after being advised of his rights again. The prosecutor was not attempting to capitalize on defendant's reliance on the Miranda warnings and the questions were not an impermissible comment upon defendant remaining silent. Moreover, the evidence against defendant was convincing and the jury would probably have reached the same result without any error.

**2. Constitutional Law— effective assistance to counsel—failure to object**

Defendant's counsel was not ineffective in not objecting to portions of the prosecutor's cross-examination of defendant. Defense counsel's actions did not fall below an objective standard of reasonableness, and did not affect the outcome of the case.

Appeal by defendant from judgment entered 16 November 2006 by Judge Milton F. Fitch, Jr. in Wilson County Superior Court. Heard in the Court of Appeals 14 December 2006.

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General Richard L. Harrison, for the State.*

*Miles & Montgomery, Attorneys, by Lisa Miles, for defendant-appellant.*

JACKSON, Judge.

On 7 March 2005, James Ezzell ("defendant") was indicted for murder, and on 16 November 2005, the jury found defendant guilty of second-degree murder. The trial court sentenced defendant to a minimum of 125 months imprisonment with a corresponding maximum of 158 months. The court also ordered defendant to pay restitution in the amount of $14,850.03. Defendant gave timely notice of appeal.

On 2 October 2004, defendant invited several friends and family members to go four-wheeling with him on a trail in Wilson County, North Carolina. Among the people defendant invited was Jeff Winstead ("Winstead"), who, without defendant's prior approval, invited Mark Carlini ("Carlini") and Carlini's wife, Amy. The group gathered at a cabin being rented by defendant, and Carlini and his wife were introduced to defendant. The group then rode their four-wheelers on the trails, stopping occasionally to eat and drink beer.

At some point during the outing, the group stopped near a pond and talked, during which time a "heated" conversation erupted between Carlini and defendant. Carlini said to defendant, "So you're Frank Ezzell? . . . I remember you. . . . You're Frank Ezzell, the old rabbit man. You used to sell rabbits." One of defendant's friends invited on the trip explained that he "could tell tension was getting high." According to witnesses, Carlini recounted a story from when he and a friend, "Romek," were teenagers, and defendant hit Romek in the head with a gun. Despite his wife's requests to drop the matter, Carlini, who had consumed over twelve beers during the day, became increasingly excited and agitated, explaining that he was not "some young dumb kid anymore" and telling defendant, "I've been waiting 25 years to kick your ass, old man." Defendant told Carlini, "Don't start something," and Carlini then gave defendant a wraparound hug, saying, "It's okay. Water under the bridge." Two witnesses testified that they did not believe that Carlini squeezed defendant very hard, particularly since Carlini had a beer in one of his hands at the time. Defendant, however, testified that Carlini squeezed the breath out of him, squeezed him so hard his back popped, and "squeezed [him] so hard [he] wet in [his] pants." Defendant further stated that after

Carlini, who was a bigger and younger man, put defendant down, Carlini threatened "to kick [defendant's] damn ass before this day is over with."

Immediately after this incident, defendant and his girlfriend, Cynthia Edwards ("Edwards"), left the group. Two other members of the group—Robbie Jones ("Jones") and Christopher Hobson ("Hobson")—left the trails shortly thereafter. Once back at the cabin, Jones and Hobson observed defendant yelling at Edwards and telling her to go home. Jones attempted to persuade defendant to drop the matter with Carlini: "I pretty much told him—I said, 'Just leave it alone.' I said Mark [Carlini] was a little mouthy, just leave and we'll come back another day when he's not here and ride." Defendant, however, responded by saying, "I don't know if I can do that." After helping Edwards with her four-wheeler, Jones got into his truck. Jones explained he had never seen defendant talk to Edwards in such a manner and stated to Hobson, "I don't know what Frank might do, he might kill that man."

Shortly after Jones left and approximately twenty-five to thirty minutes after initially leaving Carlini and the others at the pond, defendant went back up the trail on his four-wheeler, leaving Edwards and Hobson at the cabin. Edwards expressed concern about what defendant might do, stating that defendant "probably had a gun." A few minutes later, Winstead and the Carlinis, who remained at the pond, saw defendant on the trail, "puttering up in the distance," by which Winstead meant that defendant was "just driving around, puttering a little bit, slowly." Hobson returned and informed the group of the need to leave, and then defendant approached to within fifty yards of the group and told everyone remaining, "Ya'll have ten minutes to get off of my property."

Defendant left once again, and the group began to pack up their belongings and leave the trail on their four-wheelers. Carlini led the group, followed by his wife, then Hobson, and Winstead in the rear. Hobson warned Winstead that defendant might have a gun, and Winstead then warned Carlini's wife of that possibility. Winstead caught up with Carlini and warned him, "Mark, he might have a gun. Don't say anything. Be good. Let's just go."

As the group proceeded along the trail, Hobson noticed that Carlini and defendant were riding approximately twenty-five feet away from one another. Hobson, who was approximately one hundred yards away at the time, observed that Carlini and defendant

were riding slowly and had their heads turned to each other. Hobson testified, "I could tell that they were talking, arguing, or whatever it may be. But I could not hear what they were saying." According to Hobson, at no time did Carlini attempt to ram defendant on the four-wheeler. Hobson then attempted to catch up with them, and when he was approximately twenty-five or thirty feet behind them, he observed defendant pull out a gun and shoot Carlini.

Hobson slammed on the brakes when he heard the gunshot, and he saw that Carlini stopped his four-wheeler. Hobson and Carlini's wife ran to Carlini, and Hobson testified that "Mark said, 'I've been shot,' or 'He shot me.' I can't remember which he said. Amy thought he might have been joking at first because he was sitting on his four-wheeler. I said, 'Let me check you.' I looked down his side and I saw a hole in his shirt." Carlini then appeared to go into shock, "and he just slumped forward." Defendant meanwhile left the scene, and Hobson did not see defendant after the shooting. Defendant testified at trial that he drove away from the scene and hid his guns under pine straw near a pine tree. After Carlini slumped over on his four-wheeler, Carlini's wife jumped on the four-wheeler and drove to the nearest residence where they called 911. Carlini was pronounced dead at the hospital.

Police responded to the residence from which the 911 phone call was placed, and Hobson showed the police where the shooting had occurred. The police were alerted to be on the lookout for defendant, and Detective J.T. Bass ("Detective Bass") spotted defendant on a four-wheeler in the distance. Detective Bass turned to inform a fellow officer that he had spotted an individual that matched defendant's description. Detective Bass testified, "As I turned back to look, the individual on the four-wheeler pretty much did a circle turn and left . . . ." Police officers continued to search for defendant, and Deputy Steven Babcock ("Deputy Babcock") eventually "observed the defendant peeking over the top of the beans" in a nearby field. Deputy Babcock then apprehended and arrested defendant. Defendant subsequently was indicted, and on 16 November 2005, the jury found defendant guilty of second-degree murder.

**[1]** On appeal, defendant contends that the trial court erred in permitting extensive cross-examination by the State questioning defendant's exercise of his right to remain silent. We disagree.

At trial, defense counsel failed to object to those portions of the cross-examination that defendant now challenges on appeal. Accord-

STATE v. EZZELL

[182 N.C. App. 417 (2007)]

ingly, we review defendant's contentions under the plain error standard. *See State v. Augustine*, 359 N.C. 709, 717, 616 S.E.2d 515, 523 (2005), *cert. denied*, —— U.S. ——, 165 L. Ed. 2d 988 (2006).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (emphasis and alterations in original) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).

As our Supreme Court has explained,

> [i]t is well established that a criminal defendant has a right to remain silent under the Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, and under Article I, Section 23 of the North Carolina Constitution. A defendant's decision to remain silent following his arrest may not be used to infer his guilt, and any comment by the prosecutor on the defendant's exercise of his right to silence is unconstitutional. "A statement that may be interpreted as commenting on a defendant's decision [to remain silent] is improper if the jury would naturally and necessarily understand the statement to be a comment on the [exercise of his right to silence.]"

*State v. Ward*, 354 N.C. 231, 266, 555 S.E.2d 251, 273 (2001) (alterations in original) (quoting *State v. Mitchell*, 353 N.C. 309, 326, 543 S.E.2d 830, 840-41, *cert. denied*, 534 U.S. 1000, 151 L. Ed. 2d 389 (2001)). Furthermore, "[o]nce a defendant has been advised of his right to remain silent, 'it is a violation of defendant's rights under the Fourteenth Amendment to the Constitution of the United States to then impeach the defendant on cross-examination by questioning him about the silence.' " *State v. Quick*, 337 N.C. 359, 367, 446 S.E.2d 535,

540 (1994) (quoting *State v. Hoyle*, 325 N.C. 232, 236, 382 S.E.2d 752, 754 (1989)). "Nevertheless, a comment implicating a defendant's right to remain silent, although erroneous, is not invariably prejudicial. Indeed, such error will not earn the defendant a new trial if, after examining the entire record, this Court determines that the error was harmless beyond a reasonable doubt." *Ward*, 354 N.C. at 251, 555 S.E.2d at 265 (internal citations omitted).

In the case *sub judice*, Deputy Babcock testified that he gave defendant *Miranda* warnings at the scene of the crime. Defendant nevertheless waived his rights and chose to answer Deputy Babcock's questions without a lawyer present. En route to the patrol car, defendant voluntarily informed Deputy Babcock that the firearm was "up by the barn where we were all at." Defendant attempted to show officers where the firearm was located, although the firearm was not recovered that evening. Deputy Babcock testified that defendant asked about Carlini's condition and whether he was still alive, to which Deputy Babcock responded that he did not know. Defendant twice told Deputy Babcock that he shot Carlini in self-defense. Deputy Babcock attempted to ascertain what happened that day that led to the shooting, and during his testimony, Deputy Babcock read from a statement he had prepared around the time of the arrest:

> DEPUTY BABCOCK: I asked Ezzell, "What in the world happened?" Ezzell stated, "The guy ran me off the path into the ditch. I almost flipped, so I shot him." I asked Ezzell, "Weren't ya'll hanging out together earlier today?" Ezzell answered, "Yes. We were drinking some beers. The guy kept looking at me and said, 'I know you, you're Frank Ezzell,' and then started talking about something I was supposed to have done 20 years ago." Ezzell stated that Mark later squoze [sic] him so hard that he couldn't breathe. Ezzell stated, "You've seen him. He's a big boy." As we approached my patrol car, Ezzell stated, "I bet you he don't call me an old motherfucker anymore."

Detective Bass testified that after arriving at the sheriff's office, defendant once again was given *Miranda* warnings. This time, defendant asserted his right to remain silent.

After Deputy Babcock testified, defendant testified on his own behalf. Defendant testified that Carlini threatened to break defendant's back, that Carlini rode up behind defendant and almost yanked defendant off his four-wheeler, and that Carlini tried to run defendant over the embankment of the path. Defendant further tes-

tified that Carlini was drunk and that he thought he saw Carlini snorting cocaine.

During cross-examination of defendant, the following colloquy took place:

PROSECUTOR: Now, you mentioned that you saw him [Carlini] lean down across the four-wheeler, you said you thought that he was doing what appeared to be cocaine; is that correct?

DEFENDANT: Yes.

PROSECUTOR: Now, you never told any law enforcement officers about that, did you?

DEFENDANT: I didn't make a statement. When they asked me if I wanted to make a statement here, I didn't make a statement. The reason I didn't make a statement, I felt like whatever I said may get turned around.

PROSECUTOR: And you didn't tell them about the repeated threats about breaking your back either, did you?

DEFENDANT: I told you I didn't make a statement. They asked me if I wanted to make a statement. I did not make a statement.

PROSECUTOR: But you made a statement to the initial officer that apprehended you.

DEFENDANT: No, I did not make a statement to him either. What he is saying is what—what me and him were talking about. But I didn't call myself making a—necessarily a statement to him. I felt like I was probably better off not to say anything.

PROSECUTOR: But at that point you made a general statement along the lines of "I shot him in self-defense," didn't you?

DEFENDANT: Yes.

PROSECUTOR: And that's all you added, you didn't elaborate on that, you didn't tell them, "Look, here is where the four-wheeler went off," did you?

DEFENDANT: I told him he ran me off a bank. I didn't say he ran me down in a ditch. I said he ran me off the bank.

PROSECUTOR: And you didn't tell them about the use of cocaine, did you?

DEFENDANT: Uh-uh.

PROSECUTOR: And you didn't tell them about the repeated threats of breaking you over his back and I've been waiting 25 years for this moment to get even with you?

DEFENDANT: I felt like the less I said to him the better off I would be.

Defendant contends on appeal that "[t]he gist of the cross-examination was that Mr. Ezzell must be lying if he did not tell law enforcement officers everything after receiving the *Miranda* warnings," and that as a result, defendant's constitutional right to remain silent was violated.

The State, meanwhile, contends that defendant waived his right to review this issue. Here, there was no objection during the portion of the cross-examination to which defendant now takes exception, and there is no specific assertion of plain error in defendant's brief. Accordingly, defendant is not entitled to review of this issue. *See State v. Wilson*, 340 N.C. 720, 734-35, 459 S.E.2d 192, 201 (1995); *State v. Gardner*, 315 N.C. 444, 447-48, 340 S.E.2d 701, 704-05 (1986).

Nevertheless, assuming *arguendo* that defendant had asserted plain error in his brief, we hold that the prosecutor's cross-examination of defendant does not constitute *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (emphasis in original).

"[T]here is no question that a defendant who takes the stand relinquishes some constitutional rights." *State v. Washington*, 141 N.C. App. 354, 373, 540 S.E.2d 388, 401 (2000), *disc. rev. denied*, 353 N.C. 396, 547 S.E.2d 427 (2001). Regardless, under the facts and circumstances presented, we hold defendant's constitutional rights were not violated. First, defendant acknowledged that he had spoken with Deputy Babcock at the scene of the crime, even after receiving his *Miranda* warnings. *See Gardner*, 315 N.C. at 448, 340 S.E.2d at 705 ("Defendant clearly indicated that he had not, in fact, remained silent but had talked with a detective about the matter."). Defendant waived his right to remain silent with respect to comments made to Deputy Babcock at the scene of the arrest, and thus, it was entirely appropriate for the prosecutor to question defendant on what he told and did not tell Deputy Babcock at that time. *See State v. Westbrooks*, 345

N.C. 43, 65, 478 S.E.2d 483, 497 (1996) ("Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (quoting *Anderson v. Charles*, 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226 (1980))). The prosecutor questioned defendant on his reason for omitting from his voluntary discussion with Deputy Babcock such important facts as that Carlini had been drunk and possibly on cocaine and that Carlini had threatened defendant's life several times prior to the shooting. It would have been natural and expected for defendant to have mentioned such details to Deputy Babcock. *See State v. Fair*, 354 N.C. 131, 156, 557 S.E.2d 500, 519 (2001) ("Cross-examination can properly be made into why, if the defendant's trial testimony . . . is true, he did not include in his earlier statement the relevant information disclosed at trial."), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002); *see also State v. McGinnis*, 70 N.C. App. 421, 424, 320 S.E.2d 297, 300 (1984). As such, "[t]he prosecutor did not attempt to capitalize on the defendant's reliance on the implicit assurances of the Miranda warnings." *State v. Mitchell*, 317 N.C. 661, 667, 346 S.E.2d 458, 462 (1986). Accordingly, "[w]hatever motives prompted the cross-examination questions, neither they nor defendant's responses constituted an impermissible comment upon the defendant's invocation of his constitutional right to remain silent." *Gardner*, 315 N.C. at 449, 340 S.E.2d at 705.

Finally, "even assuming, *arguendo*, the violation of a constitutional right, admission of the evidence complained of was harmless beyond a reasonable doubt. This is so because the evidence presented by the State was very convincing." *Gardner*, 315 N.C. at 449, 340 S.E.2d at 705 (citations omitted). The evidence in the case *sub judice* included, *inter alia*: (1) that defendant admitted to shooting Carlini; (2) testimony by Hobson who witnessed the shooting and denied that Carlini attempted to ram defendant's four-wheeler; (3) testimony that both defendant and Carlini had been drinking prior to the shooting; (4) that some of the other people present prior to the incident believed defendant to have a gun and the intention to take action against Carlini; (5) that defendant left Carlini's presence after being squeezed by Carlini yet nevertheless returned a short while later; (6) that defendant initially hid the weapons; and (7) that defendant left the scene of the shooting and was apprehended later crouching in a bean field. In sum, evidence presented by the State was very convincing that defendant intended to kill Carlini. Therefore, "[e]ven

had the exchange on cross-examination constituted error, we conclude that, absent such error, the jury probably would have reached the same result." *Id.* at 450, 340 S.E.2d at 706. Accordingly, defendant's assignment of error is overruled.

[2] Defendant, in his final argument, contends that his trial counsel's failure to object at trial to the portions of the prosecutor's cross-examination regarding defendant's invocation of the right to remain silent constituted ineffective assistance of counsel. We disagree.

"To prevail on a claim of ineffective assistance of counsel, a defendant must first show that his counsel's performance was deficient and then that counsel's deficient performance prejudiced his defense." *State v. Allen*, 360 N.C. 297, 316, 626 S.E.2d 271, 286 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984)), *cert. denied*, —— U.S. ——, 166 L. Ed. 2d 116 (2006). "The fact that counsel made an error, even an unreasonable error, does not warrant reversal of a conviction unless there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings." *State v. Braswell*, 312 N.C. 553, 563, 324 S.E.2d 241, 248 (1985). Furthermore, "[c]ounsel is given wide latitude in matters of strategy," *State v. Fletcher*, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001), *cert. denied*, 537 U.S. 846, 154 L. Ed. 2d 73 (2002), and "[i]neffective assistance of counsel claims are not intended to promote judicial second-guessing on questions of strategy as basic as the handling of a witness." *State v. Lowery*, 318 N.C. 54, 68, 347 S.E.2d 729, 739 (1986) (internal quotation marks and citations omitted).

Whether or not defense counsel should have objected to the portion of the cross-examination at issue in the instant appeal, we decline to find that defense counsel's actions fall below an objective standard of reasonableness. As discussed *supra*, the State's questioning of defendant was proper. "There was no basis for an objection by trial counsel, and thus there was no ineffective assistance of counsel." *Fair*, 354 N.C. at 168, 557 S.E.2d at 526. Furthermore, even if defense counsel's actions could be characterized as unreasonable, we conclude that defendant's counsel's failure to object did not affect the outcome of the case. This brief questioning spanned less than two of the approximately 400 transcript pages, and cannot be construed to constitute the "extended comment" of which our Supreme Court has warned. *See Ward*, 354 N.C. at 251, 555 S.E.2d at 264 (quoting *State v. Banks*, 322 N.C. 753, 763, 370 S.E.2d 398, 405 (1988)). The questioning here could not have tainted a case that otherwise included convinc-

ing evidence of defendant's guilt, and accordingly, this assignment of error is overruled.

No Error.

Judges CALABRIA and GEER concur.