IN THE SUPREME COURT OF NORTH CAROLINA

No. 427PA17

Filed 29 March 2019

STATE OF NORTH CAROLINA

v.

JERMAINE ANTWAN TART

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, ___ N.C. App. ___, 808 S.E.2d 178 (2017), vacating in part and finding no error in part in judgments entered on 26 August 2016 by Judge V. Bradford Long in Superior Court, Forsyth County. On 9 May 2018, the Supreme Court allowed defendant's conditional petition for discretionary review as to additional issues. Heard in the Supreme Court on 8 January 2019.

*Joshua H. Stein, Attorney General, by Michael T. Henry, Assistant Attorney General, for the State-appellant/appellee.*

*Sarah Holladay for defendant-appellee/appellant.*

MORGAN, Justice.

This criminal appeal presents two issues for the Court to resolve: whether a short-form indictment sufficiently charged attempted first-degree murder when the wording of the indictment did not precisely duplicate the language of the relevant statute and whether a prosecutor's remarks during closing argument were so grossly

improper that the trial court should have intervened *ex mero motu*. While we agree with the Court of Appeals that the State's characterizations during its closing argument do not entitle defendant to a new trial, we reject the lower appellate court's determination regarding the short-form indictment and hold that the indictment was sufficient to vest the trial court with subject-matter jurisdiction to try defendant for attempted first-degree murder. Accordingly, we affirm in part and reverse in part the decision of the Court of Appeals.

*Factual and Procedural Background*

In late February 2014, defendant Jermaine Antwan Tart was residing at a homeless shelter in Winston-Salem where the victim in this case, Richard Cassidy, was a volunteer worker. On 2 March 2014, Cassidy was leading a group of shelter residents, including defendant, as they walked to an overflow location of the shelter. During the walk to this area, defendant made several inappropriate comments and began to speak incoherently. Defendant suddenly began to assault Cassidy from behind, stabbing Cassidy in the head and knocking him to the ground. Defendant then got on top of Cassidy and continued to attack him, striking Cassidy's head, neck, shoulder, and back with a knife. Even after another shelter resident attempted to intervene in order to try to stop the attack, defendant persisted in his assault of Cassidy. A law enforcement officer arrived on the scene and was able to stop defendant's attack on Cassidy. Although the injuries that Cassidy sustained were

serious and life-threatening, he survived the assault. Defendant subsequently stated during interviews with law enforcement officers and mental health professionals that he was upset with Cassidy because Cassidy had allowed others to steal from him, had disrespected defendant, and had shot defendant when defendant was a child.

Defendant was charged with the offenses of attempted first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury. At trial, there was no dispute that defendant had stabbed Cassidy. The sole contested question concerned defendant's mens rea, namely, whether defendant had the specific intent to attempt to commit first-degree murder.

The State introduced testimony from Richard Blanks, M.D., an expert in the field of forensic psychiatry, who opined that an individual can have a specific intent and a delusion at the same time. Also in his testimony, Dr. Blanks offered defendant's belief that Cassidy had allowed others to steal from defendant as an example of defendant's non-delusional reasons for being angry with Cassidy, even if defendant's beliefs were actually inaccurate. Dr. Blanks testified that these beliefs constituted identifiable non-delusional reasons that could cause defendant to be angry with Cassidy and would further evidence defendant's specific intent to kill Cassidy.

Dr. Christine Herfkens, a psychologist and expert in forensic and clinical neuropsychology who was a witness for the defense, testified that defendant had a long history of mental illness, including schizoaffective disorder and antisocial

personality disorder, which is a disorder formerly known as sociopathy. Defendant's medical records indicated that he had been admitted to state hospitals at least twelve times between 2002 and 2014, each time exhibiting homicidal ideation, which Herfkens defined as the desire to kill another person. In addition, defendant was dependent on both alcohol and marijuana.

At the close of the State's evidence and again at the close of all of the evidence, defendant moved to dismiss both charges against him, arguing that he had demonstrated diminished capacity and the absence of the specific intent to kill. The trial court denied these motions. The jury subsequently found defendant guilty of attempted first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury. The trial court sentenced defendant to concurrent terms totaling 207 to 261 months of imprisonment.

Defendant appealed to the Court of Appeals and raised two arguments, neither of which was presented to the trial court. First, defendant challenged the indictment that purported to charge him with attempted first-degree murder, claiming that it was insufficient to confer subject-matter jurisdiction on the trial court. Specifically, defendant noted that the short-form indictment utilized for the attempted first-degree murder charge included one word from the statutorily approved language for charging manslaughter along with the prescribed wording for a murder offense. Second, defendant contended that certain remarks in the prosecutor's closing argument at trial were so grossly improper that the trial court committed reversible

error in failing to intervene *ex mero motu*. In a unanimous, unpublished opinion issued on 5 December 2017, the North Carolina Court of Appeals agreed with defendant's indictment argument and vacated his attempted first-degree murder conviction, but found no error in the trial court's silence during the State's closing argument and therefore upheld the assault conviction. *See State v. Tart*, ___ N.C. App. ___, 808 S.E.2d 178, 2017 WL 6002771 (2017) (unpublished).

On 14 December 2017, the State filed a petition for *writ of supersedeas* and application for temporary stay in this Court. The following day, this Court stayed the decision of the Court of Appeals. On 11 January 2018, the State filed a petition seeking discretionary review of the Court of Appeals' decision regarding sufficiency of the indictment for attempted first-degree murder, and on 22 January, defendant filed a conditional petition for discretionary review of the Court of Appeals' resolution of the closing argument issue. This Court allowed both petitions for discretionary review on 9 May 2018.

*Analysis*

I. *Facial Sufficiency of the Short-form Attempted First-degree Murder Indictment*

North Carolina General Statutes section 15-144 sets out the appropriate phrasing which can be utilized in indictments for the criminal offenses of murder and manslaughter. The statute reads in pertinent part:

> [I]t is sufficient in describing murder to allege that the

accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed), and concluding as is now required by law; and it is sufficient in describing manslaughter to allege that the accused feloniously and willfully did kill and slay (naming the person killed), and concluding as aforesaid . . . .

N.C.G.S. § 15-144 (2017). The indictment in the case at bar, in charging defendant with the criminal offense of attempted first-degree murder, states in pertinent part: "the defendant [Jermaine Antwan Tart] unlawfully, willfully and feloniously did attempt to *kill and slay* Richard Cassidy with malice aforethought." (Emphasis added).

A comparison of the statutory requirements to sufficiently charge a person in an indictment for an offense pertaining to murder under N.C.G.S. § 15-144 and the challenged indictment in the instant case offers two notable observations: (1) the phrase "malice aforethought" appears in both the statutory requirements and the current indictment, and (2) the phrase "kill and murder," which is statutorily associated with an offense pertaining to murder in an indictment, is replaced in the current indictment with the phrase "kill and slay," which is statutorily associated with an offense pertaining to manslaughter in an indictment. Therefore, the indictment that this Court evaluates for its sufficiency to charge defendant with the offense of attempted first-degree murder contains language associated not only with an offense pertaining to murder—namely, "malice aforethought"—but also with an offense pertaining to manslaughter—namely, "kill and slay"—as designated in

N.C.G.S. § 15-144.

The State argues that the Court of Appeals erred by employing a new "interchangeability" analysis with respect to the construction of indictments that do not adhere verbatim to their authorizing statutes. In considering the indictment charging defendant with attempted first-degree murder in the present case, the Court of Appeals concluded:

> The indictment in question fails to comply with the short form indictment authorized by N.C.G.S. § 15-144. It states the following: "[t]he jurors for the State upon their oath present that on or about [the dates of offense shown and in the county named above] the defendant named above unlawfully, willfully and feloniously did attempt to *kill and slay* Richard Cassidy with malice aforethought." (emphasis added). It does not allege Defendant attempted to "kill and murder"—the requisite language for murder. Instead it contains the phrase "kill and slay"—the requisite language for manslaughter. The terms "murder" and "slay" are not interchangeable. Thus, this indictment is insufficient to charge attempted murder and the trial court lacked jurisdiction to enter judgment on this charge.

*Tart*, 2017 WL 6002771, at *3 (second set of brackets in original). We agree with our colleagues at the lower appellate court that "[t]he terms 'murder' and 'slay' are not interchangeable," *id.*; however, the usage of the word "slay" in place of the word "murder" in the indictment here is a distinction without a difference because the indictment against defendant also charged that the killing was done "with malice aforethought." *Id.* Under such circumstances as those present in the case at bar, the words that appear in the short-form indictment are sufficient to charge attempted

first-degree murder.

The plain language of N.C.G.S. § 15-144, coupled with consideration of the constitutional purpose of indictments, dictates our determination that the indictment here effectively withstands challenge. An indictment is "a written accusation of a crime drawn up by the public prosecuting attorney and submitted to the grand jury, and by them found and presented on oath or affirmation as a true bill." *State v. Thomas*, 236 N.C. 454, 457, 73 S.E.2d 283, 285 (1952) (citations omitted). "Except in misdemeanor cases initiated in the District Court Division, no person shall be put to answer any criminal charge but by indictment, presentment, or impeachment." N.C. Const. art. I, § 22. This constitutional provision is intended

> (1) [to provide] such certainty in the statement of the accusation as will identify the offense with which the accused is sought to be charged; (2) to protect the accused from being twice put in jeopardy for the same offense; (3) to enable the accused to prepare for trial, and (4) to enable the court, on conviction or plea of *nolo contendere* or guilty[,] to pronounce sentence according to the rights of the case.

*State v. Greer*, 238 N.C. 325, 327, 77 S.E.2d 917, 919 (1953) (citations omitted).

N.C.G.S. § 15-144 is clear that a short-form indictment for *murder* is sufficient if it alleges "the accused person feloniously, willfully, and of his *malice aforethought*, did *kill and murder* (naming the person killed)," while a short-form indictment for *manslaughter* is sufficient if it alleges "the accused feloniously and willfully did *kill*

*and slay* (naming the person killed)." N.C.G.S. § 15-144 (emphases added). An examination of this statutory language reveals that there are two express differences in the terminology utilized by the General Assembly to establish short-form indictments for the offenses of murder and manslaughter that are critical to the case at bar: (1) the reference in manslaughter offenses that the named defendant did slay an individual, compared with the reference in murder offenses that the defendant did "murder" an individual; and (2) the mandated inclusion in an indictment for a murder offense of the essential element of "malice aforethought," while the allegation of "malice aforethought" is not required to charge manslaughter. The critical and dispositive difference between short-form indictments for murder offenses and manslaughter offenses is the substantive allegation of the element of "malice aforethought" in murder offense short-form indictments, rather than the employment of the synonyms "slay" in manslaughter offense short-form indictments or "murder" in murder offense short-form indictments upon which the Court of Appeals chose to focus.

*Black's Law Dictionary* defines the noun "murder" as "[t]he killing of a human being with malice aforethought,"[1] *murder*, *Black's Law Dictionary* (10th ed. 2014) [hereinafter *Black's*], and defines the verb "slay" as "[t]o kill (a person), esp. in battle," s*lay*, *Black's*. It is evident from the plain legal definitions of the words "murder" and

---

[1] *Black's Law Dictionary* does not supply a definition for the word "murder" when used as a verb.

"slay" that there is no meaningful distinction between the two terms for the purpose of ascertaining the sufficiency of the description of the attempted first-degree murder offense as alleged in the current case that defendant had attempted to kill a human being or person named Richard Cassidy. While it may have been a better practice for the prosecution here to replicate the specific language of N.C.G.S. § 15-144 in alleging defendant's commission of the offense of attempted first-degree murder, the prosecution's failure to do so did not render the indictment fatally defective. The prosecution's proper and necessary inclusion of the legal element "malice aforethought" in the present indictment's charge of attempted first-degree murder substantively and constitutionally distinguishes this charge from an alleged manslaughter offense—despite the usage of the term "slay" instead of the term "murder"—because, as required by *Greer* in its construction of the pertinent provisions of the Constitution of North Carolina, the short-form indictment under review provided such certainty in the statement of the accusation as would identify the offense with which defendant was charged, protected defendant from being put in double jeopardy for the same alleged offense, enabled defendant to prepare for trial, and enabled the trial court to pronounce a sentence upon defendant's conviction of attempted first-degree murder. *Greer*, 238 N.C. at 327, 77 S.E.2d at 919. Therefore, the short-form indictment was sufficient to vest the trial court with subject-matter jurisdiction over this charge.

We hold that the use of the term "slay" instead of "murder" in an indictment

that also includes an allegation of "malice aforethought" complies with the relevant constitutional and statutory requirements for valid murder offense indictments and serves its functional purposes with regard to both the defendant and the court. *See id.* at 327, 77 S.E.2d at 919; *see also State v. Rankin*, ___ N.C. ___, ___, 821 S.E.2d 787, 790-91 (2018) ("The law disfavors application of rigid and technical rules to indictments; so long as an indictment adequately expresses the charge against the defendant, it will not be quashed."). Accordingly, we reverse the Court of Appeals' decision on this issue and reinstate the judgment entered upon defendant's conviction for attempted first-degree murder.

## II. Remarks during the State's Closing Argument

Defendant contends that the Court of Appeals erred in failing to find that the trial court should have intervened *ex mero motu* during the State's closing argument. Specifically, defendant draws our attention to comments made to the jury by the prosecutor that defendant "had the specific intent to kill many people, over a 20-year period of time," and that if the jury did not convict, defendant would be "unleashed, yet again, onto our streets." Defendant also argues that there was gross impropriety in the State's claims to the jury that defendant's potentially delusional beliefs were a valid foundation upon which the jury could find that defendant possessed the requisite specific intent for the commission of the offense of attempted first-degree murder. Defendant asserts that these statements were so grossly improper and prejudicial that he is entitled to a new trial. After careful consideration, we cannot

fault the trial court in declining to interject itself into the State's closing argument when defendant himself chose to refrain from objecting to these remarks at trial. Accordingly, we affirm the Court of Appeals on this issue.

This Court noted in *State v. Jones*, 355 N.C. 117, 127, 558 S.E.2d 97, 103 (2002):

> A lawyer's function during closing argument is to provide the jury with a summation of the evidence, *Herring v. New York*, 422 U.S. 853, 861-62, 45 L. Ed. 2d 593, 599-600 (1975), which in turn "serves to sharpen and clarify the issues for resolution by the trier of fact," *id.* at 862, 45 L. Ed. 2d at 600, and should be limited to relevant legal issues. *See State v. Allen*, 353 N.C. 504, 508-11, 546 S.E.2d 372, 374-76 (2001).

Regarding closing arguments made to the jury during criminal trials, the North Carolina General Statutes provide that "an attorney may not: (1) become abusive, (2) express his personal belief as to the truth or falsity of the evidence, (3) express his personal belief as to which party should prevail, or (4) make arguments premised on matters outside the record." *Jones*, 355 N.C. at 127, 558 S.E.2d at 104 (discussing N.C.G.S. § 15A-1230(a) (1999)). Through our precedent, this Court has elaborated on the statutory provisions governing closing arguments and emphasized that closing arguments "must: (1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passions or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial." *Id.* at 135, 558 S.E.2d at 108.

Nonetheless,

> [w]here a defendant fails to object to the closing arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. "To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). " '[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' " *State v. Hipps*, 348 N.C. 377, 411, 501 S.E.2d 625, 645 (1998) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999).

*State v. Mitchell*, 353 N.C. 309, 324, 543 S.E.2d 830, 839 (2001), *cert. denied*, 534 U.S. 1000, 151 L. Ed. 2d 389 (second alteration in original); *see also State v. Anthony*, 354 N.C. 372, 427, 555 S.E.2d 557, 592 (2001) ("[O]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996))), *cert. denied*, 536 U.S. 930, 153 L. Ed. 2d 791 (2002). While these cited cases and their progeny do not in any way diminish the professional, ethical expectations for prosecutors in making their final arguments to the fact-

finder, they serve to establish the standards and considerations by which the actions or inactions of the neutral trial judge must be measured during the parties' closing arguments in a criminal trial, especially when the party challenging the propriety of the opposing party's closing argument in such a criminal trial is silent during the rendition of the disputed remarks, but on appeal challenges the trial judge's simultaneous silence. In circumstances in which a defendant in his or her role as an obvious interested party in a criminal trial fails to object to the other party's closing statement at trial, yet assigns as error the detached trial judge's routine taciturnity during closing arguments in the absence of any objection, this Court has consistently viewed the appealing party's burden to show prejudice and reversible error as a heavy one. *See Anthony*, 354 N.C. at 427, 555 S.E.2d at 592.

Even when a reviewing court determines that a trial court erred in failing to intervene *ex mero motu*, a new trial will be granted only if "the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Jones*, 355 N.C. at 131, 558 S.E.2d at 106 (citations omitted). "[T]o warrant a new trial, the prosecutor's remarks must have perverted or contaminated the trial such that they rendered the proceedings fundamentally unfair." *State v. Mann*, 355 N.C. 294, 307-08, 560 S.E.2d 776, 785 (citation omitted), *cert. denied*, 537 U.S. 1005, 154 L. Ed. 2d 403 (2002). In assessing whether this level of prejudice has been shown, the challenged statements must be considered "in context and in light of the overall factual circumstances to which they refer." *State*

*v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995) (citing *State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *and overruled on other grounds by*, *inter alia*, *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988)), *cert. denied*, 516 U.S. 1148, 134 L. Ed. 2d 100 (1996).). Thus, "[o]nly when it finds *both* an improper argument and prejudice will this Court conclude that the error merits appropriate relief." *State v. Huey*, 370 N.C. 174, 179, 804 S.E.2d 464, 469 (2017) (emphasis added) (citing *Jones*, 355 N.C. at 134-35, 558 S.E.2d at 108-09).

In applying the analysis enunciated in the cited case law to determine whether or not there was any impropriety in the prosecutor's closing argument, defendant emphasizes the "substantial evidence of [defendant's] mental illness and inability to form specific intent" and contends that the challenged remarks by the prosecution "lacked a reasonable basis in the record and appealed to the passions and prejudices of the jury." Before this Court,[2] defendant identifies three portions of the State's closing argument as grossly improper.

In the first instance, the prosecutor told the jury that defendant's mental health history

> is ripe with examples of violence, and homicidal ideations,
> the desire and intent to kill other people. The mental

---

[2] In the Court of Appeals, defendant challenged additional portions of the State's closing argument, but defendant did not petition this Court for review of the Court of Appeals' ruling on those portions, and therefore we do not address them here.

illness, if he did in fact suffer one, it didn't prevent him from forming the specific intent to kill. *He had the specific intent to kill many people, over a 20-year period of time.* That mental illness continued to come back up through all of these diagnoses, through all of these hospitalizations.

(Emphasis added).

Defendant characterizes the Court of Appeals' review of these comments, in which it opined that "each [challenged] term was referenced during testimony and has a basis in the record," *Tart*, 2017 WL 6002771, at 4, as "wrongly conflat[ing]" the legal concept of "specific intent" with the psychiatric concept of "homicidal ideation." The only definition of "homicidal ideation" given to the jury at trial came from Herfkens, who testified as an expert on defendant's behalf about defendant's past mental health issues and who described "homicidal ideation" as "the intent, the desire to kill another person." She then testified that defendant's "homicidal ideation" appeared "throughout his mental health records." Dr. Richard Blanks, an expert in forensic psychiatry who appeared on behalf of the State, testified that defendant's "[t]houghts and desires to kill other people" were a "consistent theme" in his hospital admission records. In addition, defendant told Cassidy during the stabbing that defendant was "going to kill" Cassidy. The mens rea element of specific intent to kill has been defined in our legal system as being existent when a "defendant intended for his action to result in the victim's death." *State v. Phillips*, 365 N.C. 103, 141, 711 S.E.2d 122, 149 (2011) (*State v. Keel*, 333 N.C. 52, 58, 423 S.E.2d 458, 462 (1992)),

*cert. denied*, 565 U.S. 1204, 182 L. Ed. 2d 176 (2012). Further, the prosecutor's summation comments must be considered in context and in light of the overall factual circumstances to which they refer, as required by *Alston*, which here equated to the State's rebuttal of defendant's staunchest position at trial that his mental illness precluded him from forming the specific intent to kill Cassidy as required to sustain a conviction for attempted first-degree murder or assault with a deadly weapon with intent to kill or both. Indeed, the prosecutor framed these disputed statements during the State's closing argument in a manner that served to sharpen and clarify the issues for the jury, as characterized in *Herring*, by explaining that any mental illness defendant had "didn't prevent him from forming the specific intent to kill." In this context and in light of the evidence adduced at trial that included references adopted by the prosecutor that were gleaned from expert testimony, the first portion of the State's closing argument challenged by defendant did not constitute gross impropriety so as to require the trial court to intervene *ex mero motu*. This passage from the prosecutor's closing statement was premised on matters contained in the record in compliance with *Jones* and was consistent with the specific guidelines for closing arguments as set out by the General Assembly in N.C.G.S. § 15A-1230(a) and reiterated in *Jones*.

In the second excerpt from the State's closing argument denounced by defendant, the prosecutor argued:

> You are, in a very real way, the conscience of our

community. You are the ones who are standing on the wall. You're the ones who are standing up for [the victim, Cassidy], who, for the last 10 years of his life, has stood up for the poor, for the marginalized, for the forgotten, and for the hopeless.

You can stand up for him. You can protect our communities and ensure that a homicidal, manipulative, sociopath, is not unleashed, yet again, onto our streets.

. . . You can protect our communities and ensure that a homicidal, manipulative, sociopath, is *not unleashed, yet again, onto our streets.*

I'm not asking you to do anything other than follow the law.

(Emphasis added). Defendant contends that the reference to being "unleashed" was inflammatory and prejudicial. In addressing this statement, the Court of Appeals noted that appellate courts "have upheld other similar 'hyperbolic expression[s] of the State's position that a not guilty verdict, in light of the evidence of guilt, would be an injustice.'" *Tart*, 2017 WL 6002771, at *4 (alteration in original) (first quoting *State v. Pittman*, 332 N.C. 244, 262, 420 S.E.2d 437, 447 (1992) (holding, as described by the Court of Appeals, *Tart*, 2017 WL 6002771, at *4, that "the prosecutor's statement indicating if the defendant was not convicted 'justice in Halifax County will be dead' was not improper"); and then citing *State v. Brown*, 177 N.C. App. 177, 189-90, 628 S.E.2d 787, 794-95 (2006)). We agree with the lower appellate court that this type of vivid communication to the jury falls within the realm of permissible hyperbole on the part of the State in line with our precedent. *See State v. Braxton*, 352 N.C. 158, 203, 531 S.E.2d 428, 454 (2000) (opining that the State's argument that the

defendant's self-defense claim was "vomit on the law of North Carolina" was permissible hyperbole), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *see also State v. Harvell*, 334 N.C. 356, 363, 432 S.E.2d 125, 129 (1993) (stating that failure to convict the defendant would amount to "a wound that's going to fester" was permissible hyperbole).

The final passage of the State's closing argument which defendant argues is grossly improper and prejudicial concerns the prosecutor's reference to defendant's potentially delusional, but factually plausible, motives for stabbing Cassidy. This portion of the prosecutor's summation would encompass defendant's claims that Cassidy allowed defendant's medication to be stolen and told defendant to put defendant's belongings away, that Cassidy had disrespected defendant, and that Cassidy had shot defendant when defendant was a child. Defendant posits now that there is no evidence in the trial record to show that these events actually occurred and therefore "[w]holly imagined events cannot create a rational basis for a defendant's actions." Following a competency hearing, the trial court found defendant to be competent to stand trial for the charged offenses. During the trial, references were made to these events through testimonial evidence that is contained in the record. Based on the evidence generated during the trial and the accompanying issues, defendant's mental state was argued to the jury by the State and the defense in their respective closing arguments. Later, the jury was instructed on the concept of diminished capacity and its possible effect on the ability to form the specific intent

to kill. As previously noted, the principles espoused by this Court in *Jones*, *Mitchell*, and *Alston* are jointly invoked so as to establish that the prosecutor's closing argument in this arena of the case is substantiated by the trial record's context, that the prosecutor's statements about the existence of defendant's motives to harm Cassidy served to sharpen and clarify the issues for the jurors as the triers of fact, and that ultimately the trial court was not under a duty to intervene *ex mero motu* during the State's closing argument because the summation was not grossly improper.

In light of the facts and circumstances of this case, the trial record, the legal theories presented by the parties, and the applicable law, we cannot conclude that the trial court erred in declining to interject itself into the State's closing argument while defendant chose to sit silently and raise no objection to the now-challenged remarks. The portions of the State's summation that have been addressed before this Court do not rise to the level of those previously found in our case decisions to be so grossly improper as to require *ex mero motu* action by the trial court. Accordingly, we affirm the Court of Appeals' decision on this issue.

*Conclusion*

In sum, we reverse the determination by the Court of Appeals regarding the sufficiency of the short-form indictment and reinstate the judgment entered upon defendant's conviction for attempted first-degree murder. We affirm the portion of

the Court of Appeals' decision which concludes that the trial court did not abuse its discretion in declining to intervene *ex mero motu* during the State's closing argument.

AFFIRMED IN PART; REVERSED IN PART.

Justice DAVIS did not participate in the consideration or decision of this case.

Justice EARLS concurring in part and dissenting in part.

I agree with the majority's holding that "the indictment in this case was sufficient to vest the trial court with subject matter jurisdiction to try defendant for attempted first-degree murder." Nonetheless, a new trial is warranted because the prosecutor's statements to the jury in this case are similar to statements this Court has previously held to be improper and to constitute prejudicial error necessitating a new trial, even when not objected to at trial. In addition, the trial judge should have intervened *ex mero motu* during the prosecutor's closing argument when the prosecutor urged the jury to convict Jermaine Antwan Tart based not on whether Mr. Tart had the requisite mental intent at the time of the offense but rather out of fear that as a "homicidal, manipulative, sociopath" who "had the specific intent to kill many people, over a 20-year period of time," he would be "unleashed, yet again, onto our streets" to kill innocent people. Thus, I would reverse the decision of the Court of Appeals and remand for a new trial.

The prosecutor's closing argument was improper in two significant respects, each one independently sufficient to justify a new trial. Together they assuredly dictate that result. The first impropriety was the prosecutor's inflammatory name-calling and fear mongering, including calling defendant "a homicidal sociopath" four times during the closing argument. The second impropriety was the prosecutor's reliance on events that all the evidence showed never happened as "factual" motivations supposedly leading defendant to decide to kill Mr. Cassidy. Take away

these parts of the prosecution's closing argument and all that is left is the prosecutor's appropriate description of the attack itself, summary of defendant's actions immediately after the attack, and discussion of the jury instructions. The improprieties that occurred were not mere throwaway lines in a long and proper argument; they were the heart of the prosecutor's presentation to the jury. The nature of the improper statements "rendered the proceedings fundamentally unfair." *State v. Mann*, 355 N.C. 294, 308, 560 S.E.2d 776, 785 (citation omitted), *cert. denied*, 537 U.S. 1005 (2002).

1.  Standard of Review

Two different standards apply when reviewing cases involving improper closing arguments, depending on whether there was an objection at trial. If the defendant made a timely objection, the question is "whether the trial court abused its discretion by failing to sustain the objection." *State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002). The standard of review for improper closing arguments when, as in this case, the defendant fails to object is "whether the argument complained of was so grossly improper that the trial court erred in failing to intervene *ex mero motu.*" *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835 (1999).

This Court has explained that "[w]hen the prosecutor becomes abusive, injects his personal views and opinions into the argument before the jury, he violates the rules of fair debate and it becomes the duty of the trial judge to intervene to stop

improper argument and to instruct the jury not to consider it." *State v. Smith*, 279 N.C. 163, 166, 181 S.E.2d 458, 460 (1971). In *Smith* the Court concluded that "[i]n these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence." *Id.* at 166, 181 S.E.2d at 460 (quoting *Berger v. United States*, 295 U.S. 78, 89 (1935)). In reviewing statements made during closing arguments, this Court does not examine the statements in isolation but rather "give[s] consideration to the context in which the remarks were made and the overall factual circumstances to which they referred." *State v. Dalton*, 369 N.C. 311, 316, 794 S.E.2d 485, 489 (2016) (quoting *State v. Ward*, 354 N.C. 231, 265, 555 S.E.2d 251, 273 (2001)). "Improper remarks may be prejudicial either because of their individual stigma or because of the general tenor of the argument as a whole." *Jones*, 355 N.C. at 133, 558 S.E.2d at 108.

2. Improper Name-Calling and Appeals to Prejudice

There can be no doubt that in this case the only issue the jury needed to determine was whether Mr. Tart had the requisite mental capacity to intend to kill Mr. Cassidy. There was no dispute over whether Tart was the person who attacked Cassidy; Tart agreed that there should not be a self-defense instruction, and both the prosecution and the defense argued to the jury in closing that the only question for them was Mr. Tart's state of mind at the time of the attack. The only issue for the jury was whether defendant was delusional and unable to form the intent to kill, as the defense contended: "This whole case turns on the capacity of Mr. Tart's mind,

around 8 o'clock at night at First Presbyterian Church in downtown Winston-Salem on March 2nd, 2014. Was he capable of forming the specific intent to kill Mr. Cassidy? . . . [W]as his mind all there enough for him to be able to?" Or was he intending to kill Mr. Cassidy with premeditation, as the prosecution argued: "The intent, his intent to kill Richard Cassidy is written all over this case. It is written in blood. His intent to kill Richard Cassidy is a stain on the sidewalk in front of First Presbyterian Church." Additionally, the court instructed the jury on the issue of lack of mental capacity as it related to both the attempted first-degree murder charge and the charge of assault with a deadly weapon with intent to kill inflicting serious injury.[1]

In these circumstances, the prosecutor's repeated statements that Tart is a "violent, manipulative, homicidal sociopath" were not intended to shed light on whether he was indeed delusional at the time of the attack but rather to make the point that defendant needed to be incarcerated so he would not harm anyone else. The prosecutor's statements "were purposely intended to deflect the jury away from its proper role as a fact-finder by appealing to its members' passions and/or prejudices," causing the remarks to be prejudicial and grossly improper. *Jones*, 355 N.C. at 134, 558 S.E.2d at 108. The prosecutor hammered home this theme by referencing the testimony of Dr. Herfkens who, it must be said, had examined Tart

---

[1] For example, with regard to the attempted murder charge, the jury was instructed, "If, as a result of lack of mental capacity, the Defendant did not have the specific intent to kill Mr. Cassidy, formed after premeditation and deliberation, the Defendant is not guilty of Attempted First Degree Murder."

and concluded that "at the time of the crime, Jermaine was acting under the influence of a severe mental illness that did not allow him to properly understand reality and the significance of his alleged actions." Nevertheless, the prosecutor used that evidence to make this argument to the jury:

> But what she did consider is the Defendant's mental health history, a 20-year mental health history.
>
> Members of jury [sic], that is ripe with examples of violence, and homicidal ideations, the desire and intent to kill other people. The mental illness, if he did in fact suffer one, it didn't prevent him from forming the specific intent to kill. He had the specific intent to kill many people, over a 20-year period of time. That mental illness continued to come back up through all of these diagnoses, through all of these hospitalizations.
>
> Antisocial Personality Disorder, a disorder characterized by violence. By deceit. By manipulation. By an inability to conform your conduct to the confines of the law. . . . You know what a synonym is for someone who suffers from Antisocial Personality Disorder? A sociopath.
>
> So the Defendant is a violent, manipulative, homicidal sociopath. That's his diagnosis. Based on that. They want you to just give him a slap on the wrist for this. Because he's been diagnosed as a homicidal sociopath, we'll let you do this.
>
> . . . .
>
> . . . You can protect our communities and ensure that a homicidal, manipulative, sociopath, is not unleashed, yet again, onto our streets.

The prosecutor set up this argument to use the pejorative term "sociopath" by referencing and asking about the term in his cross-examination of Dr. Herfkens, and

in his questioning of Dr. Blanks when called by the State to rebut the testimony of Dr. Herfkens, and he persisted in using the word even though both experts testified that the term is no longer used by medical professionals.

Notably, the prosecutor used a tactic similar to one that this Court found improper in *State v. Dalton*, 369 N.C. at 314, 320, 794 S.E.2d at 488, 491, in which the prosecutor attempted to dissuade the jury from finding the defendant not guilty by reason of insanity because such a verdict could result in the defendant "be[ing] back home in less than two months." (Emphasis omitted.) In *Dalton*, the evidence presented at trial concerning the defendant's severe mental illness did not support the prosecutor's assertions that the defendant would "very possibl[y]" be released in fifty days. *Id.* at 318, 794 S.E.2d at 490. Nevertheless, as in *Dalton*, the statement here that "[y]ou can protect our communities and ensure that a homicidal, manipulative, sociopath, is not unleashed, yet again, onto our streets" is also prejudicial because the remark was not directed at the issue the jury needed to decide under the law but rather was intended to create the fear of future harm. *See, e.g.*, *id.* at 319, 794 S.E.2d at 490 (Regarding defendants with mental health issues, prosecutors must remember that "[t]he level of possibility or probability of release is not the salient issue; rather, it is the evidence and all reasonable inferences that can be drawn from that evidence which govern counsel's arguments in closing."). Just as with the insanity defense at issue in *Dalton*, the diminished capacity defense requires the defendant's own attorney to provide evidence of the defendant's mental illness.

*See, e.g., id.* at 320, 794 S.E.2d at 491 (Jackson, J., concurring) ("Because the defendant has the burden of proving the affirmative defense of insanity, even the defendant's own attorney may provide evidence that the defendant's mental illness caused him or her to engage in conduct that a jury might find shocking or reprehensible." (citing *State v. Wetmore*, 298 N.C. 743, 746-47, 259 S.E.2d 870, 873 (1979))).  Here there is considerable evidence that Mr. Tart was incapable of knowing right from wrong at the time of the crime: for example, his assertions that Mr. Cassidy had killed him in 1989 and more recently arranged for others to kill him again, and his statements to police right after the incident that he heard Mr. Cassidy say he was going to have Mr. Tart killed and that Cassidy had shot him in the head when he was eight years old.  Thus, as in *Dalton*, "a juror who believes the evidence of [diminished capacity] might nevertheless be motivated to find the defendant guilty based on fear for the safety of the community."  *Id.* at 322, 794 S.E.2d at 492 (citing *State v. Hammonds*, 290 N.C. 1, 224 S.E.2d 595 (1976)).

The prosecutor's rhetoric in his closing argument likely sparked fear in the minds of the jurors that defendant was like a wild animal who, if "unleashed . . . onto [the] streets," would again try to kill someone.  "This Court does not condone comparisons between defendants and animals." *State v. Roache*, 358 N.C. 243, 297, 595 S.E.2d 381, 416 (2004).  The prosecutor's use of language more identified with an animal, such as "unleashed," dehumanized defendant and was only heightened by the prosecutor's repeated, derogatory name-calling that characterized defendant as a

homicidal sociopath.  Using this theme of fear, the prosecutor "improperly [led] the jury to base its decision not on the evidence relating to the issues submitted, but on misleading characterizations, crafted by counsel, that [were] intended to undermine reason in favor of visceral appeal."  *Id.* at 297-98, 595 S.E.2d at 416 (first alteration in original) (quoting *Jones*, 355 N.C. at 134, 558 S.E.2d at 108).  Rather than mere "hyperbole," these statements were improper and highly prejudicial in the circumstances of this case.

The prosecutor's further assertion that defendant had the specific intent to kill many people over a twenty-year period was drawn in part from an expert witness's report that defendant had murderous ideations that could be defined as an intent. The prosecutor then took this information and manipulated it to suggest to the jury that defendant had been roaming the streets looking for someone to kill and would do so again.  As this Court observed in *State v. Miller*, 271 N.C. 646, 657, 157 S.E.2d 335, 344 (1967), "[d]efendants in criminal prosecutions should be convicted upon the evidence in the case, and not upon prejudice created by abuse administered by the solicitor in his argument."

This Court has previously found less derogatory statements about a defendant to be plain error justifying a new trial, even when the defendant did not object at trial.  In describing the defendant in *Smith*, the prosecutor stated he was "lower than the bone belly of a cur dog."  279 N.C. at 165, 181 S.E.2d at 459.  This Court granted the defendant a new trial and noted that by failing to intervene in the prosecutor's

argument, the trial judge "was derelict in his duty." *Id.* at 167, 181 S.E.2d at 461. In *State v. Matthews*, 358 N.C. 102, 111, 591 S.E.2d 535, 542 (2004), this Court concluded that counsel engaged in improper name-calling by referring to the defendant's theory of the case as "bull crap." (Emphasis omitted.)

In *Jones* the prosecutor in his closing argument compared the Columbine school shootings and the Oklahoma City bombing with the defendant's crime, which this Court noted was "a thinly veiled attempt to appeal to the jury's emotions." 355 N.C. at 132, 558 S.E.2d at 107. The Court held the closing arguments to be improper and prejudicial, and vacated the defendant's death sentence because the trial judge failed to intervene. *Id.* at 132-35, 558 S.E.2d at 107-09. Indeed, the Court there noted: "[T]his Court is mindful of the reluctance of counsel to interrupt his adversary and object during the course of closing argument for fear of incurring jury disfavor." *Id.* at 129, 558 S.E.2d at 105; *see also State v. Moss*, 180 W. Va. 363, 368, 376 S.E.2d 569, 574 (1988) (finding that a prosecutor's statements that a defendant was a "psychopath" and needed to be convicted of first-degree murder so that he would "never be released to slaughter women and children" in the community were plain error and denied the defendant his fundamental right to a fair trial).

The statements made by the State in its closing argument here were grossly improper and required the trial court to intervene *ex mero motu*. This Court has long established that a defendant has a "right to a fair and impartial trial . . . . where passion and prejudice and facts not in evidence may have no part." *State v. Smith*,

240 N.C. 631, 636, 83 S.E.2d 656, 659 (1954). It is within the court's power and "is the duty of the judge to interfere when the remarks of counsel are not warranted by the evidence, and are calculated to mislead or prejudice the jury." *Id.* at 635, 83 S.E.2d at 659 (citations omitted). The purpose of this protection is "to safeguard the rights of litigants and to be as nearly sure as possible that each party shall stand before the jury on equal terms with his adversary, and not be hampered in the prosecution or defense of his cause, by extraneous considerations, which militate against a fair hearing." *Id.* at 635, 83 S.E.2d at 659 (quoting *Starr v. S. Cotton Oil Co.*, 165 N.C. 587, 595, 81 S.E. 776, 779 (1914)). It is imperative that the prosecutor remember "that the State's interest 'in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " *Matthews*, 358 N.C. at 112, 591 S.E.2d at 542 (quoting *Berger*, 295 U.S. at 88).

3. Referring to Delusions as Fact

The second impropriety in the prosecutor's argument occurred when he suggested that delusional thoughts and statements about things that never happened could have rationally led Jermaine Tart to form the requisite specific intent to kill Mr. Cassidy. At two different times in his closing argument, the prosecutor referred to events that Cassidy testified did not happen, and he urged the jury to find that those events explained why Tart's attack on Cassidy was rationally motivated by a premeditated intent to kill untouched by diminished mental capacity. The prosecutor referred to each of these things that never happened as a "factual, non-delusion

reason, or motivation for doing what he did." It is improper for counsel to make arguments that are not based on reasonable inferences that may be drawn from the evidence admitted at trial. *See State v. Anderson*, 322 N.C. 22, 37, 366 S.E.2d 459, 468 (1988).

There is simply no support for the proposition that events that never happened, such as Cassidy stealing Tart's medicine, which Cassidy testified never occurred, or Cassidy not giving Tart his telephone number, which again, Cassidy testified never happened, could appropriately be called "factual" and "non-delusional." Wholly imagined events cannot support a reasonable inference that defendant acted rationally. The mere fact that Mr. Tart tragically chose to act on his delusions is not proof of specific intent. *See Roache*, 358 N.C. at 282, 595 S.E.2d at 407. Thus, the prosecutor improperly implied that events that never occurred could be "factual" and could therefore explain a rational intent to kill.

The majority dismisses this argument by pointing out that the trial court found defendant to be competent to stand trial. This is completely beside the point. The issue is whether, at the time of this assault, Mr. Tart was suffering from a mental illness such that he lacked the mental capacity to form the requisite intent to kill with premeditation. Even the prosecution admits that defendant's mental state on the night of 2 March 2014 is what is at issue in this case. That defendant subsequently received treatment, took medications, and ultimately was found competent to stand trial answers a completely different question than whether he

suffered from a diminished mental capacity on the night of this incident. For the prosecutor to argue that things which never happened could be "factual" and could explain Tart's actions was an improper inference from the evidence presented at the trial of this case.

"In sum, improper closing arguments cannot be tolerated." *Matthews*, 358 N.C. at 112, 591 S.E.2d at 542. For all these reasons, and taking into account all the improper statements made here, I must respectfully dissent from the portion of the majority opinion that concludes the trial court did not abuse its discretion in declining to intervene *ex mero motu* during the State's closing argument. The trial court should have stopped the prosecutor's use of improper and prejudicial statements in closing argument that were designed to inflame the jury's fears, direct its attention away from the issue to be decided, and cause jurors to infer facts contrary to those in evidence. A new, fair trial is warranted.